## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **REYNALDO REYES** | : | |
| **on behalf of himself and all** | : | |
| **others similarly situated,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO.** |
| | : | |
| **v.** | : | |
| | : | |
| | | |
| **ZIONS FIRST NATIONAL BANK,** | : | |
| **NETDEPOSIT, INC. and MP** | : | |
| **TECHNOLOGIES d/b/a** | : | **JURY TRIAL DEMANDED** |
| **MODERN PAYMENTS, TELEDRAFT,** | : | |
| **INC., NATIONAL PENN BANK,** | : | |
| **HARLEYSVILLE NATIONAL BANK,** | : | |
| **WELLS FARGO BANK, N.A., and** | : | |
| **WACHOVIA BANK, N.A.** | : | |
| **Defendants** | : | |
| | : | |

## COMPLAINT – CLASS ACTION

Plaintiff Reynaldo Reyes brings this action pursuant to RICO, 18 U.S.C.

§1964(c), on behalf of himself and all others similarly situated. Plaintiff seeks to recover

treble the damages he and the members of the Class incurred as a result of defendants'

violations of 18 U.S.C. §§1962(c) and (d) whereby moneys were unlawfully, fraudulently

and without authorization withdrawn by fraudulent telemarketers from checking accounts

of plaintiff and the members of the Class and transferred to offshore Caribbean, Canadian

and Indian bank accounts, and in support hereof, avers:

**THE PARTIES**

1. Plaintiff Reynaldo Reyes is an individual residing in Maple Shade, New Jersey. He brings this action on his own behalf and on behalf of the class alleged herein.

2. Defendants Zions National Bank ("Zions Bank") is a national bank with its principal place of business in Salt Lake City, Utah. Zions National Bank is a wholly owned subsidiary of Zions Bancorporation.

3. Defendant NetDeposit LLC. ("ND") is a Nevada limited liability corporation, with its principal place of business in Salt Lake City, Utah, and is a payment processor. ND is a wholly owned subsidiary of Zions Bancorporation.

4. Defendant MP Technologies d/b/a Modern Payments ("MP") was a payment processor. MP was a wholly owned subsidiary of Zions Bancorporation. MP was merged into or otherwise combined with ND sometime in 2008.

5. Defendants Zions Bank and MP, aware that telemarketers, including the Telemarketers identified below, and individuals associated with them, were engaged in telemarketing schemes to defraud consumers, conducted an enterprise through a pattern of racketeering activity, and conspired to do so, by processing and initiating ACH transactions, opening accounts and clearing millions of dollars in ACH transactions for the benefit of the telemarketers, including the Telemarketers and individuals identified below, and by facilitating the transfer of those fraudulently obtained funds to offshore accounts in the Caribbean, Canada and India. Defendants Zions Bank and MP knew that the ACH transactions violated NACHA rules by which defendant Zions Bank was bound, and that a significant number of the ACH transactions were initiated based upon banking information fraudulently procured by telemarketers, including the Telemarketers

identified below; that such ACH transactions were frequently used to advance fraudulent telemarketing schemes; and that defendant Zions Banks' own retail customers had been victims of such schemes. Defendant Zions Bank also knew, or under "Know Your Customer" requirements should have known, that some of the telemarketers had migrated from other fraudulent payment processors, including Payment Processing Center, LLC ("PPC") and its predecessor Netchex, after that company was shut down by the United States Department of Justice for facilitating telemarketing fraud in an action in the United States District Court for the Eastern District of Pennsylvania, and Amerinet after that company, in an action brought by five state Attorneys General, was compelled to make refunds to victims of telemarketing fraud. Moreover, defendants MP and Zions Bank continued to provide such payment processing and banking services to fraudulent telemarketers, including the Telemarketers identified below, even after Wachovia Bank, N.A., another national bank, was sued in a class action in the Eastern District of Pennsylvania, for engaging in the same conduct, an action that received national publicity.

6. Defendant Teledraft, Inc. is a Delaware corporation, with its principal place of business in Tempe, Arizona. Teledraft is, and at all times relevant hereto was, a payment processor that processed transactions for fraudulent telemarketers, including some or all of the Telemarketers identified below, after those telemarketers were no longer serviced by defendant MP.

7. Defendant National Penn Bank is a national bank and a wholly owned subsidiary of National Penn Bancshares, Inc. Its principal place of business is in Boyertown, Montgomery County, Pennsylvania.

8. Defendant Harleysville National Bank is a national bank and a wholly owned subsidiary of Harleysville National Corporation. Its principal place of business is in Harleysville, Berks County, Pennsylvania.

9. Defendant Wells Fargo Bank, N.A. is a national bank and a wholly owned subsidiary of Wells Fargo & Co. In January, 2009, Wells Fargo & Co. acquired defendant Wachovia Bank, N.A., a national bank. Wells Fargo Bank has its principal place of business in San Francisco, California. Wachovia has its principal place of business in Charlotte, North Carolina.

10. The Defendants identified in paragraphs 7-9 hereof (collectively the "Bank Defendants") conducted an enterprise and conspired with defendants Zions Bank and MP by opening accounts for one or more of the Telemarketers, receiving funds into those accounts from defendant MP, and by facilitating the transfer of the fraudulently obtained funds in those accounts to offshore accounts in the Caribbean, Canada and India. Defendants National Penn, Harleysville, Wells Fargo and Wachovia knew, or under "Know Your Customer" requirements applicable to national banks reasonably should have known, that their depositors were telemarketers and that the Office of the Comptroller of the Currency considered telemarketers to be high risk accounts, whose frequent wire transfer of funds to offshore accounts was evidence of fraudulent activity and money laundering.

## OTHER PERSONS AND ENTITIES

11 The "NHS/PHS" group of telemarketers consists of the following:

(a). NHS Systems, Inc. ("NHSI"), d/b/a National Healthcare Solutions ("NHS") and National Health Net Online ("NHNO"), is a Pennsylvania corporation

formed in 2006, with its principal place of business in Collegeville, Pennsylvania in this district. NHSI is a telemarketer. At all times relevant hereto NHSI has fraudulently telemarketed one or more products or services, including non-existent government grants and worthless discount health service programs.

(b). Physician Health Service, LLC ("PHS"), d/b/a American Health Benefits On Line ("AHBO"), is a Missouri limited liability company formed in May 2007, with its principal place of business in Florida, and is affiliated with or a sister company of NHSI. PHS is a telemarketer. At all times relevant hereto PHS has fraudulently telemarketed one or more products or services, including worthless discount health service programs.

(c). Harry F. Bell, Jr. is an individual, is President of NHSI and resides in this district. At all times relevant hereto, Bell, acting alone and in concert with others, has formulated, directed, controlled and/or participated in the acts and practices of NHSI, including those set forth in this Complaint. Bell, acting alone and in concert with others, has also formulated, directed, controlled and/or participated in the operation and management of PHS, including registering its web-site using an NHSI Visa debit card for payment.

(d). Health Management, LLC is a Missouri limited liability company formed in late 2007. In February 2008, Health Management took over the customers of NHSI. Health Management is a telemarketer and has continued the fraudulent practices of NHSI.

(e). Donna Newman is an individual and is President of PHS and Health Management. At all times relevant hereto, Newman, acting alone and in concert with

others, has formulated, directed, controlled and/or participated in the acts and practices of PHS and Health Management, including those alleged in this Complaint. Newman has also provided substantial services to NHSI, including retrieving its mail from a mail-drop and opening a mail-drop for it at the same address as a PHS mail-drop.

(f). John E. Bartholomew is an individual. At all times relevant hereto, Bartholomew, acting alone and in concert with others, has formulated, directed, controlled and/or participated in the acts and practices of NHSI and PHS, including those alleged in this Complaint. Bartholomew registered an NHNO website and dealt with its former mailing agent. Bartholomew also arranged for a company registered in his name to allow AHBO to use a postage permit registered in that company's name. Bartholomew is also the president of Interface Management, Inc. d/b/a Galaxy Member Benefits ("Galaxy").

(g). Nicole Bertrand is an individual and resident of Montreal, Quebec, Canada. She has served as the primary contact between the NHS/PHS enterprises, including NHSI, Physician Health Service, Health Management, Physician Health Systems and PHS Enterprises/Plus Health Savings, and their payment processors, including MP and Teledraft. Bertrand was a principal of First National Health Care Benefits, a fraudulent telemarketer identified in the Wachovia case described in paragraphs 5 and 54(j) hereof. Bertrand was also a defendant in an action brought by the New York Attorney General against Alini International Marketing alleging fraudulent telemarketing of credit cards, and is subject to a permanent injunction and criminal and civil contempt orders in that case.

(h). Barry Kirstein is an individual and resident of Montreal, Quebec, Canada. He and Bertrand live together, and Bertrand defers to Kirstein on matters alleged in this complaint. Kirstein is the ranking authority in the NHS/PHS enterprises, and together with Bertrand he has served as the primary contact between the NHS/PHS enterprises, including NHSI, Physician Health Service, Health Management, Physician Health Systems and PHS Enterprises/Plus Health Savings, and their payment processors, including MP and Teledraft. Kirstein was a principal of First National Health Care Benefits, a fraudulent telemarketer identified in the Wachovia case described in paragraphs 5 and 54(j) hereof.

(i). Plus Health Savings, Inc. is a Pennsylvania corporation formed in 2007, with its principal place of business in Collegeville, PA, in this district. It has the same address as NHSI. It was formed by Bell on instructions from Bertrand and Kirstein. Plus Health Savings took over the customers of PHS Enterprises, is a telemarketer and has continued the fraudulent practices of PHS Enterprises.

(j). Physicians Health Systems, Inc. is a Delaware corporation and shares the same address as NHSI in Collegeville, PA in this district. It also uses the same fictitious name – AHBO – as American Health Services. Physicians Health Systems is a telemarketer. At all times relevant hereto Physician Health Systems has fraudulently telemarketed one or more products or services, including worthless discount health service programs.

(k). 6676529 Canada, Inc. ("6676529") is located in Montreal, Quebec, Canada. Bertrand is President of 6676529. Bell, on behalf of NHSI, contracted with 6676529 to manage the affairs of NHSI. Funds fraudulently obtained by NHSI from

plaintiff and the members of the Class were then transferred to Canadian accounts maintained by 6676529.

(l). "Dannie Boie" ("Boie") is the name used by a person whose identity is unknown. Boie is believed to operate from Las Vegas, Nevada and/or the Caribbean nation of St. Lucia. Boie has acted as a primary contact and operational manager for the NHS/PHS scheme. He is the author and recipient of numerous relevant email communications, and has acted as the primary contact for multiple vendors to the NHS/PHS scheme telemarketers. He has also acted on behalf of First Step Management, Gold Dot and Nevada Business Solutions, identified below.

(m). PHS Enterprises is a Nevada corporation formed in December 2006. In January 2007 it opened a payment processing account with defendant MP, at approximately the same time as NHSI did so. Bertrand and Kirstein were the primary contacts between PHS Enterprises and MP. PHS Enterprises is a fraudulent telemarketer.

(n). First Step Management, Inc. is located in the Caribbean nation of St. Lucia. It has received in St. Lucia over $1 million dollars of funds fraudulently obtained by NHS/PHS from plaintiff and the members of the Class. It purports to provide information concerning United States Government grants and health care services, both of which have been "products" or "services" fraudulently marketed by telemarketers, including the Telemarketers.

(o). Gold Dot, Inc. is located in the Caribbean nation of St. Lucia. It has the same address as First Step Management. It purports to provide internet sales and telemarketing services. Gold Dot has received in St. Lucia over $100,000 of funds fraudulently obtained by NHS/PHS from plaintiff and the members of the Class..

(p). Linke Jn Paul ("Linke") is an individual who resides in Las Vegas, Nevada and/or St. Lucia. He is the sole director of First Step Management, and one of the two directors of Gold Dot.

(q). Tasha Jn Paul ("Tasha"), formerly known as Tasha Swensen, is an individual who resides in Las Vegas, Nevada and/or St. Lucia. She is one of the two directors of Gold Dot.

(r). Nevada Business Solutions, Inc. is a Nevada corporation formed on May 27, 2008. It shares the same address as PHS Enterprises, and is a telemarketer. In July 2008, after negotiations it which it was represented by Boie, Nevada Business Solutions entered into a contract by which thousands of consumers were to be enrolled in and charged for a worthless medical discount program. Those consumers' names were derived from a combined list of victims of the NHS/PHS scheme, and Nevada Business Solutions was merely a vehicle to resume charging their accounts after a TRO was entered in the action described in paragraph 12 below.

12. NHS, PHS, Bell, Newman and Bartholomew were all named as defendants in the case of <u>Federal Trade Commission v. NHS Systems, Inc., et al</u>, Civil Action No. 08CV2215, United States District Court for the Eastern District of Pennsylvania, in which they were alleged to have engaged in fraudulent telemarketing. A consent Preliminary Injunction was entered in that case on June 10, 2008. The FTC subsequently identified additional entities and persons who were involved in that telemarketing scheme and/or continued it after entry of the preliminary injunction, using different names and entities. The FTC therefore amended its complaint to add those persons and entities

9

identified in paragraphs 11(g)-(r) hereof as defendants and obtained additional injunctive relief as to them.

13. Edward Mishan is an individual doing business as E. Mishan and Sons, Inc., Emson, QX Telecom, LLC., Wellquest, Inc., WQ Long Distance, QXT and ABD Long Distance. The various entities under which Mishan does business (the "Mishan Companies") are telemarketers. Those entities have fraudulently telemarketed worthless health care products and services, prepaid long distance calling cards and long distance telephone access. Mishan and Wellquest International were defendants in an action brought by the Federal Trade Commission in the United States District Court for the Central District of California, alleging, *inter alia*, telemarketing fraud. The action was concluded by entry of a Stipulated Consent Decree.

14. Platinum Benefit Group and related entities are telemarketers. They were identified by the Attorneys General of North Carolina, Ohio, Florida, Illinois and Vermont as fraudulent telemarketers in an action brought against Amerinet, their payment processor.

15. David Giorgione is the president of Platinum Benefit Group

16. Vexedle d/b/a IDINS, is a telemarketer located in Arizona, which has taken unauthorized payments from consumer checking accounts allegedly for identity theft protection.

17. RxSmart is a telemarketer with a mail-drop in Champlain, New York, on the Canadian border, and has taken unauthorized payments from consumer checking accounts.

18. RTS Group, Inc.("RTS") and related companies have engaged in fraudulent telemarketing. The fraudulent telemarketing offerings used by RTS include Dialing USA, Fly Free Travel, RR Escapes, Communications Plus Long Distance, Ideal Wealth Builder, Ideal Financial Solutions, Unlimited Communications, US Grant Interactive Software and Florida Fun Vacations.

(a). City West Advantage ("CWA") is a sister corporation to RTS and has engaged in fraudulent telemarketing. The fraudulent telemarketing offerings used by CWA include Apex, Dialing USA, Unified Services, Ultra Thermo Boost 2000, Call USA, Online Advantage, Long Distance USA, Global Internet Service, Herbal Weight Loss Supplements, Coast2Coast Travel Club, Advantage Communications and Slim Body Fuel.

(b).  Ideal Financial Solutions ("IFS") is an affiliate of RTS, also engaged in fraudulent telemarketing.

(c). Your Choice, Inc. ("Your Choice") is a telemarketing fulfillment operation affiliated with IFS.

(d). James Slemboski, Courtney Wood, Kyle Wood, Matt Wood and Michael Zeto are officers and/or directors of RTS, CWA, IFS and Your Choice and have participated in their operation and management.

(e). CWA and Slemboski were named as defendants in an action brought by the Federal Trade Commission charging them with fraudulent telemarketing. On July 22, 2008, the District Court Nevada entered a preliminary injunction in that action in favor of the FTC.

11

## JURISDICTION AND VENUE

19. Plaintiff brings this action pursuant to RICO, 18 U.S.C. §1964(c), which confers jurisdiction upon this Court over the subject matter of this action. The Court also has jurisdiction over the subject matter pursuant to 28 U.S.C. §1331 in that this action arises under the laws of the United States.

20. Venue in this district is proper pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events and omissions giving rise to the claims of plaintiff and the Class occurred in this district.  Venue is also proper pursuant to 18 U.S.C. §1965 because all defendants, with the possible exception of defendants Zions Bank, MP and Teledraft, reside, are found and/or transact their affairs in this district and the ends of justice require that all defendants be sued in this district.

## BACKGROUND FACTS

21. Telemarketing refers to the professional use of the telephone to advertise, market and/or provide services to both individual consumers and businesses.

22. By its nature, telemarketing is susceptible to being used by unscrupulous persons and companies, including the "Telemarketers" (the enterprises and persons identified in paragraphs 11-18 hereof), to defraud consumers, such as plaintiff and the members of the Class, including schemes to obtain information concerning their bank accounts, thereby allowing unscrupulous telemarketers, including the Telemarketers, to take money from the victims' bank accounts and transfer it to themselves.  Fraudulent telemarketing schemes begin with unsolicited telephone calls made in interstate and foreign commerce. During the calls, victims, such as plaintiff and the members of the Class, are induced, through misrepresentations and false promises of goods and services,

12

to provide unscrupulous telemarketers, including the Telemarketers, with personal bank account information. Unscrupulous telemarketers, including the Telemarketers, use false, misleading and high-pressure sales scripts to induce victims such as plaintiff and the members of the Class to agree to purchase products and services that are either non-existent or of negligible or wildly exaggerated value. The unscrupulous telemarketers, including the Telemarketers, then transmit the personal bank account information through the United States mail and/or interstate wire and foreign wires to payment processors, including  defendants ND, MP and Teledraft, or use such information themselves to execute ACH or remotely created check/demand draft transactions directly with banks, including defendant Zions Bank. The most common victims of fraudulent telemarketers are senior citizens.  The AARP, the National Association of Attorneys General and the Federal Trade Commission have estimated that 85 percent of the victims of fraudulent telemarketing are age 65 or older.

23. Once having fraudulently obtained a consumer's bank account information, fraudulent telemarketers, including the Telemarketers, need a mechanism by which to withdraw funds from the accounts of their victims.

24. To collect and receive money from the accounts of their victims, including plaintiff and the members of the Class, fraudulent telemarketers, including the Telemarketers, contract with payment processors, including defendants ND and MP and defendant Teledraft or directly with banks such as defendant Zions Bank. Payment processors establish an account in their own name or the name of their customer with a bank and using information regarding victims' bank accounts that is provided by the telemarketers, collect payments from the victims into that account. After receiving funds

from the victims into the account, the payment processor deducts a fee for itself and transmits the balance to the telemarketer.

25. A telemarketer or payment processor can use one of two methods to obtain payment based on the bank information of a consumer obtained and provided by a telemarketer: (1) an electronic transfer through an Automated Clearing House debit ("ACH"), or (2) a remotely created paper check/demand draft ("RCC").

26. NACHA is an association of financial institutions and regional payment systems representing more that 11,000 financial institutions, including, on information and belief, defendant Zions Bank. Its primary responsibility is to develop and maintain the operating rules and guidelines – NACHA Operating Rules – for the Automated Clearing House Network ("ACH Network").

27. The ACH Network is an electronic, batch-processing funds transfer system, governed by the NACHA Operating Rules, that provides for the interbank clearing of credit and debit payments, and is a reliable, low-cost alternative to paper checks. The ACH Network is governed by one set of national operating rules by which the financial institutions, including Zions Bank, have agreed to abide.

28. One ACH application, particularly applicable to payment processors and telemarketers, is Telephone-Initiated Entry ("TEL"). This application is used to transmit a single-entry consumer debit transaction when the consumer's authorization is obtained orally via the telephone. Under the NACHA Operating Rules, TEL entries can only be transmitted when 1) there is an existing relationship between the Originator and the consumer, or 2) there is not an existing relationship, but the consumer initiated the

telephone call. Outbound telemarketing, such as that involved in this case, does not satisfy either of those conditions.

29. The ACH system uses codes to identify the reason for returns. The return codes include several for transactions that are unauthorized. The NACHA Operating Rules require that a bank returning an ACH transaction as unauthorized obtain a Written Statement Under Penalty of Perjury from the consumer customer prior to returning the entry.

30. NACHA publishes industry return rates, both for total returns and for specific reasons. In 2007, the national average return rate for all debit ACH transactions for all reasons was 1.94%. In the same year, the national average return rate for unauthorized ACH TEL transactions was 0.14%.

31. During its regular investigations, NACHA has determined that many of the ACH entries returned as unauthorized are because a company debits a consumer without having obtained the consumer's authorization or a company obtains an authorization for a single debit but initiates multiple debits. According to NACHA, there is a correlation between high rates of entries returned as unauthorized and Originators who are not complying with NACHA rules such as those for TEL transactions; high rates of entries returned for unauthorized reasons or for other reasons, such as Insufficient Funds and Uncollected Funds, should serve as a notice that there may be a problem with the Originator's practices; and any rate above the national average should trigger questions concerning the Originator's practices.

32. According to NACHA, in addition to transactions returned as unauthorized, there are likely others that consumers do not complain about. Consumers are often embarrassed about being duped, or sometimes do not realize that they have been duped.

33. Because of the NACHA limitations on TEL entries, financial institutions such as Zions Bank should not, although some including Zions Bank do, allow telemarketers or payment processors serving telemarketers to enter ACH TEL entries. To the extent they are precluded from using ACH entries, however, fraudulent telemarketers may use RCCs as their payment device, which are not subject to the NACHA Operating Rules.

34. An RCC is an unsigned paper check that, in lieu of a signature, bears a printed notice stating "authorized by drawer" or similar language. Payment processors, including defendant Teledraft, create such drafts payable to the telemarketer, using the person's bank routing and account information as provided by the telemarketer, and deposit such drafts in the payment processors' or telemarketers' accounts. The payment processor also includes a legend stating that it is authorized by the person to prepare the RCC without the requirement of a signature.

35. RCCs are well known to be used by unscrupulous telemarketers to perpetrate consumer fraud. The Attorneys General of 35 states, the District of Columbia and of American Samoa have called upon the Board of Governors of the Federal Reserve System to eliminate such drafts because they are so frequently used to perpetrate fraud on consumers.

36. Fraudulent telemarketers, including the Telemarketers, cannot obtain funds from the checking accounts of consumers unless there is a bank that is willing to process their ACH transactions or accept RCCs made out to them, notwithstanding that such

ACH transactions violate the NACHA Operating Rules, and notwithstanding the high rates of return for both ACH and RCC transactions which are strong indications of fraud. Defendant Zions Bank has been one such bank for telemarketers, including the Telemarketers.

37. Fraudulent telemarketers, including the Telemarketers, after obtaining funds from the checking account of consumers, need to launder those funds and transfer them out of the United States so as to place them beyond reach of law enforcement agencies and consumers who seek to obtain restitution. They cannot do so unless there are banks willing to accept their instructions to wire funds to entities and persons outside the jurisdiction of the United States. The Bank Defendants have been such banks for telemarketers, including the Telemarketers.

## FACTS GIVING RISE TO THIS ACTION

38. Fraudulent telemarketers, including the Telemarketers, have during the class period engaged in fraudulent telemarketing schemes whereby they were able to obtain the bank account information of their victims, including plaintiff and the members of the Class, necessary to have ACH TEL entries or RCCs prepared on the victims' accounts.

39. As discussed above, each of the Telemarketers has been the subject of a successful government consumer fraud action or has been the subject of numerous publicly available consumer complaints. The fraudulent activities of telemarketers, including the Telemarketers, have included, but are not limited to: (a) misrepresenting that they were calling from a United States government agency that was attempting to make a direct deposit into the victim's checking account and therefore needed the victim's bank account information and then debiting the account for a so-called

processing fee; (b) misusing the names of legitimate businesses; (c) obtaining incomplete recorded authorizations that were then altered to make it appear that the victim had agreed to purchase a product or service, thereby allowing the victim's account to be debited; (d) by misrepresenting the existence and/or the nature or value of a particular product or service, when in fact the product or service was non-existent or had no or negligible value; and (e) by representing that the victim would have a period of time within which to cancel a transaction, but then debiting the victim's account before that time had expired.

40. On information and belief, telemarketers, including the NHS/PHS group, have also engaged in "slamming". "Slamming" is a form of fraud whereby a telemarketer purchases or otherwise acquires a list of consumers along with the consumer's bank account information from another telemarketer or entity that engages in the business of buying and selling such lists. Such lists are often referred to as "full data leads". Using the customer account information gleaned from the full data leads, persons are able to misrepresent to consumers that they are simply trying to verify or confirm that information, or to initiate ACH TEL or RCC transactions without ever having contact with the victim. On information and belief, NHS provided such full data leads, either directly or through a third party, to Galaxy, which also debited the accounts of members of the Class.

**FACTS AS TO PLAINTIFF**

41. In or about November 2007, Mr. Reyes received a phone call from a representative of NHS telling him that he was eligible for a government grant and that the caller needed his bank account information in order to have the grant deposited directly to

his account. The representative of NHS did not tell Mr. Reyes that there was any charge in connection with the grant or that any money would be debited from his account.

42. NHS was a new name for a fraudulent telemarketing scheme operated by Nicole Bertrand and Barry Kirstein under the name First National Healthcare Benefits, which had fraudulently and without authorization withdrawn funds from Mr. Reyes' account through a payment processor, YMA, and which were reimbursed to him in the Wachovia case identified in paragraphs 5 and 54(j) hereof.

43. Having fraudulently obtained Mr. Reyes' checking account information, on November 17, 2007, NHS initiated an ACH debit entry from his account at Commerce Bank in the amount of $29.95, which, on information and belief, was processed for NHS by defendant MP through defendant Zions Bank, and which resulted in a credit entry in an account at defendant Zions Bank. On November 29, 2007, NHS initiated a second ACH debit entry from his Commerce Bank account in the amount of $299.95, which, on information and belief, was processed for NHS by defendant MP through defendant Zions Bank, and which resulted in a credit entry in an account at defendant Zions Bank. Neither of the transactions was authorized by Mr. Reyes, nor did Mr. Reyes receive a government grant or any other consideration from NHS. When Mr. Reyes called the number he had been given on the phone by NHS, he had difficulty reaching anyone. When he finally did, he was played back a fraudulently altered "verification" recording purporting to prove that he had authorized the charges to his account. The two debit entries caused Mr. Reyes' account at Commerce to be overdrawn, resulting in at least two overdraft fees being charged by Commerce each in the amount of $35. The total damages caused to Mr, Reyes by NHS are at least $399.90.

## CLASS ACTION ALLEGATIONS

44. The Class consists of all individuals in the United States as to whom ACH debit entries or RCC drafts on their accounts were prepared  by defendants ND, MP or Teledraft or were credited to accounts at defendants Zions Bank, National Penn, Harleysville, Wells Fargo or Wachovia during the four-year period immediately preceding the filing of this action and finally charged to the class members' bank accounts by a telemarketer, including but not limited to the Telemarketers, or pursuant to information provided to defendants ND, MP or Teledraft by telemarketers, including but not limited to the Telemarketers, or who otherwise incurred any bank charges as a consequence of such ACH debit entries or RCCs.

45. The Class is so numerous that joinder of all members is impracticable. NHS alone had over 15,000 returns of unauthorized ACH debits. Data-bases maintained by MP for NHS and PHS contain over 6958 unique consumer records, and a Teledraft data-base contains approximately 29,374 unique consumer records.

47. Plaintiff is an adequate representative of the Class, and his claims are typical of those of the Class. There are no issues or defenses unique to plaintiff, and plaintiff has no conflicts with the members of the Class. Counsel for plaintiff are experienced in the prosecution of complex class action litigation and have appeared as counsel and lead counsel in nationwide class actions in courts across the United States, including Faloney et al v. Wachovia Bank, N.A., No.07 CV 1455, United States District Court for the Eastern District of Pennsylvania, an action against another national bank for facilitating telemarketing fraud in which class members received 100% restitution.

48. There are questions of law and fact that are common to the Class and which predominate over any issues affecting only individual members. Common questions include the use by the telemarketers of phones, wire and mail to fraudulently obtain account information ("access devices") from the members of the Class; the transmission of such unauthorized access devices by phone, wire and mail directly or indirectly to the ND, MP and/or Teledraft and Zions Bank; the possession by ND, MP and Teledraft and Zions Bank of those unauthorized access devices; the use by Zions Bank of interstate wires to create ACH transactions whereby funds were removed from the accounts of plaintiff and the members of the Class; the use of interstate wires by ND and/or MP to wire funds to the Bank Defendants;  the existence of the enterprises consisting of an "association-in-fact" alleged in this complaint; the money laundering by the Bank Defendants of funds taken from the Class members' accounts; the participation of the defendants in the operation and management of those enterprises consisting of "associations-in-fact" through a pattern of racketeering in violation of 18 U.S.C. §1962(c); and the participation of  MP/ND, Zions, the Bank Defendants and Teledraft in a conspiracy to violate 18 U.S.C. §1962(c) in violation of 18 U.S.C. §1962(d).

49. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual claims of the Class members are too small to warrant their bringing individual actions. To the best of plaintiff's knowledge, there is no other action brought on behalf of the Class against these defendants. The FTC action against NHS, et al described in paragraph 12 hereof was brought in this district, and it is therefore desirable for this litigation to proceed in the this Court, which is familiar with some of the underlying facts relating to the telemarketing fraud involved in

this case. There should be no difficulties in the management of this case as a class action since much of the information needed to identify the Class members and the amounts taken from their accounts should be available from the telemarketers, the Payment Processors and from defendants, including the data-bases maintained by MP and Teledraft.

## THE RICO VIOLATIONS

### Count I: Violation of 18 U.S.C. §1962(c) by Zions Bank and MP/ND

50. Defendants Zions Bank and MP/ND are an "enterprise" consisting of an "association-in-fact" as those terms are used in 18 U.S.C. §1961(4) (the "Telemarketing Facilitation Enterprise"). Zions Bank and MP/ND had a common purpose – to earn fees for facilitating fraudulent telemarketing schemes; they had a relationship through their mutual customers, the telemarketers; and the association-in-fact enterprise had a longevity sufficient to permit Zion Bank and MP/ND to pursue the enterprise's purposes. Each played a distinct role in the operation, management and control of the enterprise through separate and distinct patterns of racketeering activity. MP/ND was a payment processor, not a bank, and received, possessed and processed unauthorized access devices (i.e. the bank account information fraudulently obtained by its telemarketer customers), using interstate wires. Zions Bank, a national bank, but not a payment processor, then used those processed access devices to initiate by interstate wire ACH transactions by which the accounts of plaintiff and the members of the Class were debited. MP/ND then directed the interstate wire transfer of those funds to the Bank Defendants as part of the scheme of the telemarketers to launder them. MP/ND and Zions Bank were separately compensated for the respective services they each provided to the telemarketers.

51. Zions Bank and MP/ND is each a "person" as that term is used in 18 U.S.C. §1961(3). Each participated in the operation, management and control of the Telemarketing Facilitation Enterprise through a pattern of racketeering activity.

52. Defendants Zions Bank and MP/ND each knew, or deliberately closed its eyes to what otherwise would have been obvious to it, namely that its telemarketers clients were engaged in fraudulent activity and that by providing payment processing and banking services to them, it was facilitating that unlawful conduct.

53. Defendants Zions Bank and MP/ND each was objectively aware of the high probability that the telemarketers were engaged in fraudulent activity, and could have recognized the likelihood of the illicit conduct, but deliberately avoided learning the facts.

54. The facts known to defendants Zions Bank and MP/ND or as to which they closed their eyes and deliberately avoided learning, include, but are not limited to:

a. Zions Bank had an obligation as a matter of law and regulation to know its customers, including the fact that the clients of MP/ND were telemarketers, involved in making outbound telemarketing calls. In 2007, the Federal Reserve and Office of the Comptroller of the Currency ("OCC") republished the Bank Secrecy Act/Anti-Money Laundering Examination Manual (the "Manual") in which an entire chapter was related to Third Party Payment Processors. The Manual warned banks, including Zions Bank, that "If a bank has not implemented an adequate processor approval program that goes beyond credit risk management, it could be vulnerable to processing illicit … transactions" and that "some processors may be vulnerable to money laundering, identity theft, and fraud schemes." Key cautions in the Manual included understanding the

payment processor's merchant base, i.e., the telemarketers, and awareness of their "charge-back history." They also warned that telemarketers were, with respect to possible money laundering, high-risk accounts.

      b. As early as 1996, the Director of the Bureau of Competition of the FTC described RCCs as the "favorite method of fraudulent actors for taking consumers' money through fraudulent marketing and other scams." In March of 2008, defendant MP recommended that defendant Teledraft begin processing for NHS/PHS using RCCs.

      c. OCC Bulletin 2006-39 (9/1/06), dealing with ACH activities, contains a section separately dealing with "Third-Party Senders", i.e. payment processors such as MP/ND, which requires that "Banks that initiate ACH transactions for third-party senders should know at a minimum, for which originators [in this case telemarketers] they are initiating entries into the ACH network. Thus, banks should require third-party senders to provide information on their originator customers such as the originator's name … principal business activity, and geographic location. Also, before originating transactions, a bank should verify (directly or through a third-party sender) that the originator is operating a legitimate business."

      d. Mishan and one or more of the Mishan Companies had been defendants in an action brought by the Federal Trade Commission, charging them with telemarketing fraud.

      e. Bertrand was a defendant in an action brought by the New York Attorney General charging her with telemarketing fraud, and was subject to a permanent injunction and criminal and civil contempt orders in that case.

f. NHS in a single month had an unauthorized return rate on ACH Tel transactions far in excess of the national average. Since 2007, it has had over 15,000 ACH transactions returned as unauthorized, each of which required a sworn affidavit from the party claiming it was unauthorized. In three months of 2007, NHS had an ACH return rate exceeding 10%, 50 times the national average. In two months of 2007, it had a total return rate exceeding 40%, 20 times the national average.

g. There is a correlation between high rates of ACH  entries returned as unauthorized and Originators, such as the Telemarketers, who are not complying with NACHA rules.

h. High rates of ACH entries returned as unauthorized, or for other reasons such as insufficient funds and uncollected funds, should serve as notice that there may be a problem with the Originator's practices.

i. Processing and initiating ACH Tel transactions on behalf of outbound telemarketers, including the Telemarketers, breached Zions Bank's obligations under the NACHA Operating Rules.

j.Wachovia Bank, another national bank, was a defendant in an action alleging that it had facilitated telemarketing fraud in a manner similar to that alleged in this Complaint, a case which received widespread national publicity. Wachovia was eventually censured by the OCC for its conduct which the OCC described as "unsafe" and "unsound" practices, an action which also received widespread publicity.

k. In an action brought by the United States Department of Justice, a payment processor, Payment Processing Center, LLC ("PPC") was preliminarily and then permanently enjoyed from processing RCCs for fraudulent telemarketers. In an action by

a consortium of state Attorneys General, Amerinet, also a payment processor, was

compelled to make refunds to victims of fraudulent telemarketers serviced by it.

Nonetheless, after that injunctive relief was granted and those refunds compelled,

MP/ND and Zions Bank provided payment processing and banking services respectively

to one or more of the fraudulent telemarketers served by PPC or its predecessor Netchex,

and/or Amerinet, including Nicole Bertrand, Barry Kirstein and one or more of the

NHS/PHS telemarketers and/or their predecessors, and one or more of the Mishan

Companies.

       l.Zions Bank's own customers had complained to it of unauthorized debits

against their accounts initiated by fraudulent telemarketers and/or payment processors.

       m. MP, after terminating its relationship with NHS and PHS due to a high

rate of ACH returns, nonetheless enthusiastically recommended them to Teledraft as

customers and even recommended that Teledraft provide them with an alternate means of

accessing consumer accounts, i.e. RCCs.

       n. In September 2005, the "NACHA Risk Management News", a

publication widely circulated in the banking community, published an article captioned

"Iowa Attorney General Action Against ODFI In Telemarketing Fraud Case." The article

reported a settlement between the Iowa Attorney General and an Iowa Bank "that

processed electronic withdrawals from the bank accounts of Iowa victims of

telemarketing schemes," including agreement to a series of remedial actions and payment

of $200,000. The article quoted the Iowa Attorney General; "The law requires banks not

to assist any telemarketer when the bank knows or should have known that the

telemarketer is engaged in fraudulent conduct."

55. The account numbers and bank routing information fraudulently obtained from plaintiff and the members of the Class by the telemarketers and transmitted to defendants MP/ND are "access devices" as that term is defined in 18 U.S.C. §1029(e)(1). Those access devices were obtained by the telemarketers with intent to defraud as alleged in paragraph 22 hereof which is incorporated herein by reference. They were, therefore, "unauthorized access devices" as that phrase is defined in 18 U.S.C. §1029(e)(3).

56. The telemarketers, knowingly and with intent to defraud, trafficked in and used many thousands of unauthorized access devices identified in paragraph 55 hereof during a one year period and by such conduct obtained funds from plaintiff and the members of the Class aggregating in the thousands, if not more, of dollars. The telemarketers, with intent to defraud, also possessed many thousands of unauthorized access devices as described in paragraph 55 hereof.

57. The conduct of the telemarketers constituted multiple violations of 18 U.S.C. §§1029(a)(2) and (a)(3).

58. For the reasons stated in paragraphs 50 and 52-54 above, at least as early as January 2007 and continuing until September 2009, defendants Zions Bank and MP/ND conspired with the telemarketers and Teledraft to commit violations of 18 U.S.C. §§1029(a)(2) and (a)(3), which conspiracy is a violation of 18 U.S.C. §1029(b)(2). Violation of 18 U.S.C. §1029(b)(2) is a predicate offense for purposes of 18 U.S.C. §1962(c).

59. For the reasons stated in paragraphs 50 and 52-54 above, beginning at least as early as January 2007 and continuing until at least March, 2008, defendant MP, knowingly and with intent to defraud, possessed more than 15 unauthorized access

devices received from the telemarketers, and effected transactions using those unauthorized access devices to receive payment in the many thousands of dollars within a one year period, in violation of 18 U.S.C. §§1029(a)(2) and (3), which are predicate offenses for purposes of 18 U.S.C. §1962(c).

60. For the reasons stated in paragraphs 50 and 52-54 above, beginning at least as early as January 2007 and continuing at least March 2008, defendants MP/ND received the unauthorized access devices from the telemarketers by interstate wire, as part of a scheme and artifice to defraud, in violation of 18 U.S.C. §1343, which is a predicate offense for purposes of 18 U.S.C. §1962(c).

61. For the reasons stated in paragraphs 50 and 52-54 above, beginning at least as early as January 2007 and continuing at least until March 2008, defendant Zions Bank initiated ACH transactions by interstate wire in order to debit the accounts of plaintiffs and the members of the Class as part of a scheme and artifice to defraud, in violation of 18 U.S.C. §1343, which is a predicate offense for purposes of 18 U.S.C. §1962(c).

62. For the reasons stated in paragraphs 50 and 52-54 above, beginning at least as early as January 2007 and continuing until at least March 2008, defendant MP/ND caused funds fraudulently obtained from the accounts of plaintiffs and the members of the Class to be transferred by interstate wire to the Bank Defendants, as part of a scheme and artifice to defraud, in violation of 18 U.S.C. §1343, which is a predicate offense for purposes of 18 U.S.C. §1962(c).

63. For the reasons stated in paragraphs 50 and 52-54 above, with intent to defraud, defendants MP/ND caused sums in excess of $10,000 to be wired to the Bank Defendants for the accounts of one or more of their telemarketer clients received from

unlawful activities by the telemarketers (including mail fraud, wire fraud and access device fraud) in order to promote the carrying on of those activities which are "specified" crimes for purposes of 18 U.S.C. §1956, and to conceal and disguise the ownership and control of those funds, all in violation of 18 U.S.C. §§1956 and 1957, both of which are predicate offenses for purposes of 18 U.S.C. §1962(c).

64. The activities of the Telemarketing Facilitation Enterprise identified in paragraph 50 hereof affected interstate and foreign commerce.  The fraudulent activities of defendants MP/ND and Zions Bank were directed to plaintiff and members of the Class throughout the United States, the ACH debits and RCCs prepared by or on behalf of the telemarketers were presented by defendant Zions and Teledraft for payment to banks throughout the United States, the funds taken from plaintiff and the members of the Class were caused to be wire transferred to the Bank Defendants in interstate commerce, and the Bank Defendants wire transferred those funds in foreign commerce to accounts and persons in the Caribbean, Canada and India.

65. The banking and payment processing services provided by defendants Zions Bank and MP/ND respectively to the telemarketers were an essential element in the scheme to fraudulently obtain funds from the bank accounts of plaintiff and the members of the Class.

66. Plaintiff and the members of the Class were the intended targets of the scheme to violate RICO, 18 U.S.C. §1962(c) alleged herein, and the participation of defendants MP/ND and Zions Bank facilitated that scheme and caused financial injury to plaintiff and the members of the Class which was a reasonably foreseeable consequence of such conduct.

**Count II: Alternative Violation of 18 U.S.C. §1962(c) by Zions Bank and MP/ND**

67. Defendants Zions Bank, MP/ND and their telemarketer clients, including, but not limited to, the Telemarketers, are an "enterprise" consisting of an "association-in-fact" as those terms are used in 18 U.S.C. §1961(4) (the "Telemarketing Fraud Enterprise". The members of the enterprise had:

(a) a common purpose – to earn income by engaging in and facilitating fraudulent telemarketing schemes;

(b) a relationship among themselves as alleged in paragraph 50 hereof, and the among telemarketers through the use of a common pattern of deception, use of common vendors of "products" and "services", offering of a relatively small universe of common non-existent or worthless "products" and "services" such as government grants, travel clubs, discount health plans and phone cards, and providing to each other and third party vendors and then using full data leads, and through using Zions Bank and MP/ND; and

(c) the association-in fact enterprise had a longevity sufficient to permit them to pursue the enterprise's purposes.

(d). On information and belief, it was well known to telemarketers, including the Telemarketers, that MP was a payment processor that, despite their fraudulent conduct, history of telemarketing fraud and high rates of returns as unauthorized, would accept them as customers and process ACH transactions on their behalf.

(e). On information and belief, it was well known to telemarketers, including the Telemarketers, that Zions Bank was a bank that, despite their fraudulent

conduct, history of telemarketing fraud and high rates of returns as unauthorized, would accept them as customers and initiate ACH transactions on their behalf, in disregard of the NACHA Operating Rules by which it was bound.

(f). All of the participants in the enterprise knew, or in the case of Zions Bank and MP/ND alternatively deliberately closed their eyes to, the fact that the fraudulent schemes of the telemarketers could not be accomplished without all of their participation.

(g). the allegations of paragraph 40 are incorporated herein by reference.

68. Zions Bank and MP/ND is each a "person" as that term is used in 18 U.S.C. §1961(3). Each participated in the operation, management and control of the Telemarketing Fraud Enterprise through a pattern of racketeering activity.

69. The allegations of paragraphs 50 and 52 through 66 hereof are incorporated by reference.

**Count III: Second Alternative Violation of 18 U.S.C. §1962(c) by Zions Bank and MP/ND**

70. Defendants Zions Bank, MP/ND, their telemarketer clients and the Bank Defendants are an "enterprise" consisting of an "association-in-fact" as those terms are used in 18 U.S.C. §1961(4) (the "Telemarketing Money Laundering Enterprise"). They had a common purpose – to earn income by engaging in and facilitating fraudulent telemarketing schemes; they had a relationship as alleged in paragraphs 50 and 67 hereof and through using the services of Zions Bank and MP/ND and the Bank Defendants; and the association-in fact enterprise had a longevity sufficient to permit them to pursue the enterprise's purposes.

(a). On information and belief, it was well known to telemarketers, including the Telemarketers, that MP was a payment processor that, despite their fraudulent conduct, history of telemarketing fraud and high rates of returns as unauthorized, would accept them as customers and process ACH transactions on their behalf.

(b). On information and belief, it was well known to telemarketers, including the Telemarketers, that Zions Bank was a bank that, despite their fraudulent conduct, history of telemarketing fraud and high rates of returns as unauthorized, would accept them as customers and initiate ACH transactions on their behalf, in disregard of the NACHA Operating Rules by which it was bound.

(c). On information and belief, it was well know to telemarketers, including one or more of the Telemarketers, that, despite the fact that they were considered high risk clients with respect to money-laundering, and that they were regularly wiring money to the Caribbean, India and Canada, the Bank Defendants would comply with instructions to wire funds in their accounts to accounts in the Caribbean, India and Canada to facilitate their laundering of the money fraudulently obtained from plaintiff and the members of the Class.

(d). All of the participants in the enterprise knew, or in the case of Zions Bank, MP/ND and the Bank Defendants alternatively deliberately closed their eyes to, the fact that the fraudulent schemes of the telemarketers could not be accomplished without all of their participation.

(e). The allegations of paragraph 40 hereof are incorporated by reference.

71. Zions Bank and MP/ND is each a "person" as that term is used in 18 U.S.C. §1961(3). Each participated in the operation, management and control of the Telemarketing Money Laundering Enterprise through a pattern of racketeering activity.

.      72. The allegations of paragraphs 10. 50 and 52 through 66 hereof are incorporated by reference.

**Count IV: Violation of 18 U.S.C. §1962(d) by Zions Bank and MP/ND**

73. The allegations of paragraph 67 are incorporated herein by reference.

74. Defendants Zions Bank and MP/ND conspired with their telemarketer clients, including the Telemarketers, to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C.§1962(d).

75. The telemarketers, including the Telemarketers, are "persons" as that term is used in 18 U.S.C.§1961(3).

76. The allegations of paragraph 55-57 hereof are incorporated herein by reference The conduct of the telemarketers, including the Telemarketers, in their participation in the operation, management and control of the Telemarketing Fraud Enterprise identified herein, constituted multiple violations of 18 U.S.C. §§1029(a)(2) and (a)(3), which are predicate offenses for purposes of 18 U.S.C. §1962(c).

77. In the operation, management and control of the Telemarketing Fraud Enterprise identified herein, the telemarketers, as part of a scheme and artifice to defraud:

(a). communicated with plaintiff and the members of the Class by interstate and foreign telephone wires, including telephone calls to plaintiff Reyes in October or November 2007, to fraudulently obtain from them their bank account information, in violation of 18 U.S.C. §1343.

(b). fraudulently initiated ACH, including ACH TEL, debit entries by interstate wire against the accounts of plaintiff and the members of the Class, including those described in paragraph 43 hereof, in violation of 18 U.S.C. §1343.

(c). transmitted the bank account information they had fraudulently obtained from plaintiff and the members of the Class by interstate wire to the Payment Processors, in violation of 18 U.S.C. §1343.

(d). wire transferred the funds fraudulently obtained from plaintiff and the members of the Class to the Bank Defendants who in turn wire transferred them to offshore accounts in the Caribbean, Canada and India, often in names other than those of the Telemarketers, in violation of 18 U.S.C. §1343.

(e). Violation of 18 U.S.C. §1343 is a predicate offense for purposes of 18 U.S.C. §1962(c).

78. In the operation, management and control of the Telemarketing Fraud Enterprise identified herein, the telemarketers, as part of a scheme and artifice to defraud:.

(a). following the telephone contacts in which they fraudulently obtained the bank account information from plaintiff and the members of the Class, communicated with them by United States Mail, sending them written materials falsely misrepresenting that they had given authorization for the withdrawals from their accounts, and providing false and misleading information as to the time in which plaintiff and the members of the Class could cancel their alleged purchases or how they could seek refunds, in violation of 18 U.S.C. §1341.

(b). Violation of 18 U.S.C. §1341 is a predicate offense for purposes of 18 U.S.C. §1962(c).

79. In the operation, management and control of the Telemarketing Fraud Enterprise identified herein, the telemarketers, including the Telemarketers, directed the transfer of funds in excess of $10,000, fraudulently obtained from the accounts of plaintiff and the members of the Class, to offshore Caribbean, Canadian and Indian accounts, in some instances in the name of an entity other than the telemarketer, in an attempt to conceal or disguise the source, ownership and control of those funds, in violation of 18 U.S.C. §§1956 and 1957.

80. Violations of 18 U.S.C. §§1956 and 1957 are predicate offenses for purposes of 18 U.S.C. §1962(c).

81. The allegations of paragraphs 52-54 hereof are incorporated by reference.

82. Zions Bank and MP/ND joined the conspiracy at least as early as January 2007 when MP opened accounts for one or more of the Telemarketers.

83. The banking and payment processing services provided by Zions Bank and MP/ND to the Telemarketers were an essential element in the scheme to fraudulently obtain funds from the bank accounts of plaintiff and the members of the Class.

84. Plaintiff and the members of the Class were the intended targets of the scheme to violate RICO, 18 U.S.C. §1962(c) alleged herein, and the participation of Zions Band and MP/ND in a conspiracy to facilitate that scheme, in violation of 18 U.S.C. §1962(d), caused financial injury to plaintiff and the members of the Class which was a reasonably foreseeable consequence of such conduct.

**Count V: Alternative Violation By Zions Bank and MP/ND Of RICO, 18 U.S.C. §1962(d)**

85. The allegations of paragraph 70 are incorporated herein by reference.

86. Defendants Zions Bank and MP/ND conspired with their telemarketer clients, including the Telemarketers, and the Bank Defendants to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C.§1962(d).

87. The allegations of paragraphs 76 through 84 are incorporated herein by reference.

**Count VI: Violation  By The  Bank Defendants of 18 U.S.C.§1962(c)**

88. The allegations of paragraph 70 are incorporated herein by reference.

89. Each of the Bank Defendants is a "person" as that term is used in 18 U.S.C. §1961(3), and each participated in the operation, management and control of the Telemarketing Money Laundering Enterprise alleged herein through a pattern of racketeering activity.

90. The Bank Defendants knew, or deliberately closed their eyes to what otherwise would have been obvious to them, namely that the telemarketers, including one or more of the Telemarketers and the persons identified herein, were engaged in fraudulent activity and that by providing banking services to them, they were facilitating that unlawful conduct.

91. The Bank Defendants were objectively aware of the high probability that the telemarketers, including one or more of the Telemarketers and persons identified herein, were engaged in fraudulent activity, and could have recognized the likelihood of the illicit conduct, but deliberately avoided learning the facts.

92. The facts known to Bank Defendants, or as to which they closed their eyes and deliberately avoided learning, include, but are not limited to:

a. The Bank Defendants had an obligation as a matter of law and regulation to know their customers, including the fact that they were telemarketers involved in making outbound telemarketing calls.

b. In 2006, the Federal Reserve and Office of the Comptroller of the Currency published the Bank Secrecy Act/Anti-Money Laundering Examination Manual. The Manual identified telemarketers as high risk accounts particularly with respect to possible money laundering. The Manual also identified large or regular transfers of funds to offshore or foreign accounts as red flags that money laundering was taking place.

c. The Manual also contains a separate section relating to "holding" companies such as Wells Fargo & Co., National Bancshares, Inc. and Harleysville National Corporation, providing that they are responsible for ensuring "that comprehensive risk management policies, procedures and processes are in place across the organization to address the entire organization's spectrum of risk."

d. The Bank Defendants nonetheless opened accounts for the Telemarketers and regularly received transfers of funds into those accounts from the Payment Processors.

e. The Bank Defendants regularly honored instructions from the Telemarketers to make large transfers of funds in excess of $10,000 by wire to accounts in the Caribbean, Canada and India, often to persons and entities other than the Telemarketers, thereby facilitating money laundering by the Telemarketers, in violation of 18 U.S.C. §§1956 and 1957.

93. Violations of 18 U.S.C. §§1956 and 1957 are predicate offenses for purposes of 18 U.S.C. §1962(c).

94. The activities of the Telemarketing Money Laundering Enterprise identified in paragraph 70 hereof affected interstate and foreign commerce.  The fraudulent activities of defendants MP/ND and Zions Bank were directed to plaintiff and members of the Class throughout the United States, the ACH debits  prepared by or on behalf of the telemarketers were presented by defendant Zions and Teledraft for payment to banks throughout the United States, the funds taken from plaintiff and the members of the Class were caused to be wire transferred to the Bank Defendants in interstate commerce, and the Bank Defendants wire transferred those funds in foreign commerce to accounts and persons in the Caribbean, Canada and India.

95. Plaintiff and the members of the Class were the intended targets of the scheme to violate RICO, 18 U.S.C. §1962(c) alleged herein, and the participation of Zions Band and MP/ND in a conspiracy to facilitate that scheme, in violation of 18 U.S.C. §1962(d), caused financial injury to plaintiff and the members of the Class which was a reasonably foreseeable consequence of such conduct.

### Count VII: Violation By The Bank Defendants Of 18 U.S.C. §1962(d)

96. The allegations of paragraph 67 are incorporated herein by reference.

97. The allegations of paragraphs 68-69 are incorporated herein by reference.

98. The Bank Defendants conspired with Zions Bank, MP/ND and the telemarketers, including the Telemarketers, to violate 18 U.S.C. §1962(c) in violation of 18 U.S.C. §1962(d).

99. The allegations of paragraphs 90 through 92 are incorporated by reference.

100. The Bank Defendants joined the conspiracy at least as early as January 2008 when they opened accounts for one or more of the Telemarketers.

101. The banking services provided by the Bank Defendants to the Telemarketers were an essential element in the scheme to fraudulently obtain funds from the bank accounts of plaintiff and the members of the Class and place them beyond the reach of their recovery by plaintiff and the members of the Class.

102. Plaintiff and the members of the Class were the intended targets of the scheme to violate RICO, 18 U.S.C. §1962(c) alleged herein, and the participation of the Bank Defendants in a conspiracy to facilitate that scheme, in violation of 18 U.S.C. §1962(d), caused financial injury to plaintiff and the members of the Class which was a reasonably foreseeable consequence of such conduct.

### Count VIII: Violation By Teledraft Of 18 U.S.C. §1962(d)

103. The allegations of paragraph 67 hereof are incorporated by reference.

104. The allegations of paragraph 75 are incorporated herein by reference.

105. The telemarketers, including the Telemarketers, participated in the operation, management and control of the enterprise identified in paragraph 67 hereof through a pattern of racketeering activity. The allegations of paragraphs 55-57 and 77-80 hereof are incorporated by reference.

106. Teledraft, in violation of 18 U.S.C. §1962(d), joined the conspiracy alleged in Count V hereof to violate 18 U.S.C. §1962(c) when it took the place of MP/ND as the payment processor for fraudulent telemarketers serviced by MP, including, but not limited to, the NHS/PHS group which had defrauded plaintiff Reyes.

107. Teledraft joined the conspiracy at least as early as January 2008 when it began processing RCCs for the NHS/PHS group on the recommendation of MP even though it was also told by MP that the rate of returns as unauthorized for ACH transactions initiated by NHS/PHS was 2.9%, well above the new 1% limit imposed by NACHA.

108. Teledraft knew, or deliberately closed its eyes to what otherwise would have been obvious to it, namely that the telemarketers, including the Telemarketers, and the persons identified herein were engaged in fraudulent activity and that by providing payment processing services to them, it was facilitating that unlawful conduct.

109. Teledraft was objectively aware of the high probability that the Telemarketers and the persons identified herein were engaged in fraudulent activity, and could have recognized the likelihood of the illicit conduct, but deliberately avoided learning the facts.

110. The facts known to Teledraft, or as to which it closed its eyes and deliberately avoided learning, include, but are not limited to:

a. As early as 1996, the Director of the Bureau of Competition of the FTC described RCCs as the "favorite method of fraudulent actors for taking consumers' money through fraudulent marketing and other scams." In March of 2008, PHS began using RCCs processed by defendant Teledraft.

b. Bertrand was a defendant in an action brought by the New York Attorney General charging her with telemarketing fraud, and was subject to a permanent injunction and criminal and civil contempt orders in that case.

c. NHS in a single month had an unauthorized return rate on ACH Tel transactions far in excess of the national average. Since 2007, it has had over 15,000 ACH transactions returned as unauthorized, each of which required a sworn affidavit from the party claiming it was unauthorized. In three months of 2007, NHS had an ACH return rate exceeding 10%, 50 times the national average. In two months of 2007, it had a total return rate exceeding 40%, 20 times the national average.

d. There is a correlation between high rates of ACH entries returned as unauthorized and Originators, such as the Telemarketers, who are not complying with NACHA rules.

e. High rates of ACH entries returned as unauthorized, or for other reasons such as insufficient funds and uncollected funds, should serve as notice that there may be a problem with the Originator's practices.

f. In order to enable the Telemarketers to avoid the NACHA limits on using ACH transactions, and pursuant to the suggestion from MP, Teledraft began providing processing services to one or more of the Telemarketers using RCCs. RCCs, also known as demand drafts, are well known to be used by unscrupulous telemarketers to perpetrate consumer fraud.  The Attorneys General of 35 states, the District of Columbia and of American Samoa have called upon the Board of Governors of the Federal Reserve System to eliminate such drafts because they are so frequently used to perpetrate fraud on consumers.

g. In an action brought by the United States Department of Justice, a payment processor, Payment Processing Center, LLC ("PPC") was preliminarily and then permanently enjoined from processing RCCs for fraudulent telemarketers.

Notwithstanding that the PPC case received wide, national publicity, Teledraft continued to provide such services to telemarketers, including one or more that had been customers of PPC or its predecessor Netchex before it was shut down.

       h. In an action brought by the Federal Trade Commission, a payment processor, YMA, was charged by FTC with processing RCCs for fraudulent telemarketers. Nonetheless, Teledraft continued to provide such services to telemarketers, including one or more that had been customers of YMA.

       i. Bertrand was a defendant in an action brought by the New York Attorney General charging her with telemarketing fraud, and was subject to a permanent injunction and criminal and civil contempt orders in that case.

       j. In an action by a consortium of state Attorneys General, Amerinet, also a payment processor, was compelled to make refunds to victims of fraudulent telemarketers serviced by it, including telemarketers later serviced by Teledraft.

111. After processing RCCs for one or more of the Telemarketers, Teledraft, in furtherance of the conspiracy, switched from RCCs to processing ACH transactions on behalf of its telemarketer clients, including but not limited to the NHS/PHS group, in direct violation of NACHA rules. At the time it did so, Teledraft was subject to a Final Judgment in the United States District Court for the Southern District of Iowa, expressly prohibiting it from doing so.

113. The payment processing services provided by Teledraft to the telemarketers, including the Telemarketers, were an essential element in the scheme to fraudulently obtain funds from the bank accounts of the members of the Class.

114. Plaintiff and the members of the Class were the intended targets of the scheme to violate RICO, 18 U.S.C. §1962(c) alleged herein, and the participation of Teledraft in a conspiracy to facilitate that scheme, in violation of 18 U.S.C. §1962(d), caused financial injury to plaintiff and the members of the Class which was a reasonably foreseeable consequence of such conduct.

**WHEREFORE**, plaintiff demands judgment against defendants for threefold the damages suffered by him and the members of the Class as a result of defendants' unlawful conduct alleged herein, together with the costs of this action and a reasonable attorney's fee.

**Plaintiff demands a jury trial.**

January 26, 2010                          LANGER, GROGAN & DIVER, P.C.

                                   By:    /s/ Judah I. Labovitz   (I.D. No. 2984)
                                          Howard Langer
                                          Judah I. Labovitz
                                          John Grogan
                                          Edward A. Diver
                                          Irv Ackelsberg
                                          LANGER GROGAN & DIVER, P.C.
                                          1717 Arch Street, Suite 4130
                                          Philadelphia, PA 19103
                                          (215) 320-5660 Phone
                                          (215) 320-5703 Fax

                                          Attorneys for Plaintiff