IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REYNALDO REYES | : | CIVIL ACTION |
| *on Behalf of Himself and All Others* | : | |
| *Similarly Situated* | : | No. 10-345 |
| | : | |
| v. | : | |
| | : | |
| ZION FIRST NATIONAL BANK, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                 **March 21, 2012**

Defendants Zions First National Bank, NetDeposit, LLC, and MP Technologies (collectively

"the Zions Defendants"); National Penn Bank (National Penn), Wells Fargo Bank, N.A. (Wells

Fargo), and Wachovia Bank, N.A. (Wachovia) (collectively "the Bank Defendants"); and Teledraft,

Inc., ask this Court to dismiss Plaintiff Reynaldo Reyes's Amended Complaint in its entirety.[1]  Reyes

brings claims on behalf of himself and others similarly situated pursuant to the Racketeer Influenced

and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c).  Reyes alleges the Zions Defendants

constituted an enterprise engaged in a pattern of racketeering, in violation of 18 U.S.C. § 1962(c),

and conspired to facilitate a racketeering enterprise, in violation of § 1962(d), by deducting funds

from the bank accounts of Reyes and the other putative class members without their authorization,

on behalf of certain fraudulent telemarketers.  Reyes alleges the Bank Defendants conspired with the

telemarketers and the Zions Defendants to facilitate this scheme by laundering the proceeds of the

---

[1] After all Defendants moved to dismiss Reyes's Complaint, he filed this Amended Complaint.  After Defendants moved to dismiss the Amended Complaint, this Court directed Reyes to file a RICO Case Statement to provide additional information regarding the elements of his claims.  In response to the RICO Case Statement, all Defendants renewed their motions to dismiss—the Zions Defendants filed a joint motion, Wells Fargo and Wachovia filed a joint motion, and National Penn and Teledraft each filed a separate motion.

fraud, in violation of § 1962(d), and that Teledraft violated § 1962(d) by joining the conspiracy when it replaced MP Technologies as the payment processor for certain fraudulent telemarketers.

All Defendants move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), based on Reyes's failure to plead sufficient facts to support his claims for relief. Teledraft also moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), and improper venue pursuant to Rule 12(b)(3). Because Reyes has failed to state a claim against the Bank Defendants, their motions to dismiss will be granted. The Zions Defendants' and Teledraft's motions to dismiss will be denied.

## FACTS[2]

In November 2007, a telemarketer from National Healthcare Solutions (NHS)[3] called Reyes and falsely told him he was eligible for a government grant and, if he provided his bank account information, the government would deposit grant funds directly into Reyes's account. The

---

[2] In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The following facts are drawn from Reyes's Amended Complaint and his RICO Case Statement, which will be considered as part of his Amended Complaint. *See, e.g.*, *Glessner v. Kenny*, 952 F.2d 702, 712 n.9 (3d Cir. 1991) ("Courts may consider the RICO case statement in assessing whether plaintiffs' RICO claims should be dismissed."), *overruled on other grounds by Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 260 (3d Cir. 1995); *Heintz Corp. v. Electro Methods,* No. 94-6916, 1995 WL 405721, at *1 (E.D. Pa. June 15, 1995) (accepting facts drawn from Complaint and RICO Case Statement as true in considering motion to dismiss); *Greek Radio Network of Am., Inc. v. Vlasopoulos,* 731 F. Supp. 1227, 1234 n.12 (E.D. Pa. 1990) (referring to Complaint and RICO Case Statement collectively as "the Complaint").

[3] NHS is a fraudulent telemarketing scheme operated by Nicole Betrand and Barry Kiersten. The scheme was formerly organized under the name First National Healthcare Benefits (First National). First National also victimized Reyes by making an unauthorized withdrawal of funds from his account through payment processor YMA. Reyes was reimbursed for this unauthorized deduction in another class-action lawsuit.

telemarketer did not tell Reyes that he would incur a charge in connection with this grant, or that any money would be debited from his account.  Reyes provided information for his account at Commerce Bank, and NHS, thereafter, initiated two deductions, for $29.99 and $299.99, respectively.  Neither of these deductions was authorized by Reyes, and Reyes did not receive a government grant.  The deductions were processed by a payment processor, Defendant MP Technologies *d/b/a* Modern Payments (MP)—that is, MP provided Reyes's account information to Defendant Zions First National Bank (Zions Bank), which initiated a wire transfer of the funds from Reyes's account into an account at Zions Bank.  Because Reyes had insufficient funds in his account to cover the withdrawals, he incurred overdraft fees and suffered a loss of nearly $400.  After the two withdrawals from his account were completed, Reyes called NHS to complain and an NHS representative played him an audio recording which the representative claimed evinced Reyes's oral consent for NHS to deduct funds from his bank account.  Reyes asserts this recording was either fraudulently altered or taken out of context.

Reyes asserts fraudulent telemarketing of this type, in which unscrupulous persons and companies perpetrate schemes to obtain private information from unsuspecting individuals, is a widespread problem.  Typically, fraudulent telemarketing representatives call individuals and offer them nonexistent government grants, worthless discount health services programs, or other similarly valueless products. Once telemarketers receive consumer bank account information, they need a mechanism by which to withdraw funds from the consumer accounts.  Reyes alleges fraudulent telemarketers use two methods to deduct funds from an individual's bank account without authorization.  One method is an electronic transfer processed through an Automated Clearing House (ACH) debit, referred to as an ACH TEL debit when processed over the phone.  To complete an

ACH TEL transaction, the telemarketer provides a third-party payment processor with the consumer's bank account information.  The payment processor then directs its bank to initiate a wire transfer through the ACH system from the consumer's account into the processor's account.  After both the processor and its bank take a fee, the remaining funds are transferred into the telemarketer's bank account.  The second method is a remotely created check (RCC), which is a paper check created by a payment processor drawn on the consumer's bank account, which includes the printed statement "authorized by drawer" or other similar language in lieu of a signature.  The RCC is made out to the telemarketer and is either deposited directly into the telemarketer's account, or deposited first into the processor's account before being transferred to the telemarketer's account.  Each RCC generates a fee for the payment processor.

Reyes posits that due to the risk of fraud inherent in these kinds of telemarketing transactions, such business is heavily regulated.  For instance, pursuant to rules governing electronic payments promulgated by the National Automated Clearing House Association (NACHA), ACH TEL transactions are only permitted when there is a pre-existing relationship between the telemarketer and the consumer, or when the consumer initiated the phone call.  In other words, banks, including Zions Bank, are prohibited from conducting ACH TEL debits originated by outbound telemarketing—the practice of telemarketers initiating sales calls to strangers.  ACH TEL debits are also prohibited for recurring payments, even if not originated by outbound telemarketing.

In addition, when an ACH debit is "returned"—the process by which the transaction is reversed and the funds are returned to the account from which they were debited—the bank "undoing" the transaction must indicate the reason for the return, including if the transaction was unauthorized or there were insufficient funds.  NACHA publishes industry return rates and will

4

scrutinize and potentially fine telemarketers and banks with return rates above the national average, as high return rates are "strong indications of fraud."  Am. Compl. ¶ 41.

Reyes further asserts the NACHA operating rules and other banking laws, such as the Bank Secrecy Act and the Patriot Act, as well as handbooks and manuals of the Office of Comptroller of Currency and other industry and government agencies, require banks to perform customer due diligence designed to prevent money laundering and other illegal use of the banking system.  Among other requirements, banks must seek to understand their customers' relationships with the bank, and monitor for suspicious or potentially illegal transactions.  Enhanced due diligence requirements apply to "high-risk" customers like telemarketers.  In addition, banks are advised to screen third party payment processors—such as Defendants MP, NetDeposit, LLC (ND), and Teledraft—for which the bank performs services because payment processors can be vulnerable to processing illicit transactions.  In particular, banks should know what entities are originating a payment processor's ACH transactions, and whether those entities, such as telemarketers, are legitimate businesses.

It is against this backdrop that Reyes alleges RICO violations by Defendants, various banks and payment processors.  Reyes does not bring claims against NHS or any other telemarketer,[4] but instead alleges the Zions Defendants, the Bank Defendants, and Teledraft have violated RICO by processing and helping to launder funds obtained through fraudulent telemarketing practices.  Reyes seeks to represent a class of individuals "as to whom ACH debit entries or RCC drafts on their accounts were prepared by [D]efendants ND, MP, or Teledraft or were credited to accounts at

---

[4] The Federal Trade Commission (FTC), however, has filed suit against NHS and several related telemarketing entities for violations of the Telemarketing Sales Rule.  The FTC alleges these entities deceptively claimed they were affiliated with the government and had the ability to offer government grants, and engaged in unfair and unauthorized charges from individuals' accounts. *See* Complaint, *Fed. Trade Comm'n v. NHS Sys., Inc.*, No. 08-2215 (E.D. Pa. May 13, 2008), ECF No. 2.

[D]efendants Zions Bank, National Penn, Wells Fargo or Wachovia during the four-year period immediately preceding the filing of this action and finally charged to the class members' bank accounts by a telemarketer."  Am. Compl. ¶ 57.

Count I of Reyes's Amended Complaint alleges the Zions Defendants[5] comprised and conducted an enterprise engaged in a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).  Reyes asserts MP/ND received unauthorized access devices—fraudulently obtained consumer bank account information—from telemarketers and processed such access devices by arranging for Zions Bank to initiate ACH transactions which debited his and the class members' accounts, all constituting a pattern of racketeering activity.  After the Zions Defendants took their respective fees, MP/ND would then direct Zions Bank to transfer the funds by interstate or international wire to bank accounts held by the fraudulent telemarketers.

Reyes further asserts the Zions Defendants were well aware of the fraudulent nature of these transactions.  He notes the ACH return rates for their telemarketing clients, including the rates for debits returned as unauthorized, were dramatically higher than the national average.  NHS, for instance, had unauthorized return rates in excess of NACHA rules during every month MP/ND served as its processor.  Moreover, the telemarketers responsible for these return rates were known to have operated fraudulent schemes in the past, and several were the subject of state and federal enforcement actions for fraudulent telemarketing.  The Zions Defendants also had received complaints about the practices of at least one telemarketing client, and thus knew they were processing ACH TEL transactions for outbound telemarketing in violation of NACHA operating

---

[5] The Zions Defendants include Zions Bank and two payment processors, MP and ND.  Reyes asserts MP merged into ND sometime in 2008, and these entities are thus hereinafter referred to as MP/ND. While MP/ND and Zions Bank are separate corporate entities, they are wholly owned subsidiaries of Zions Bancorporation.

rules.

Count II alleges the Zions Defendants conspired to facilitate other, separate RICO enterprises consisting of groups of fraudulent telemarketers. Reyes asserts the Zions Defendants, through their conduct described above, knowingly assisted several different "Telemarketer Enterprises," including the enterprise alleged to have defrauded him, "the NHS/PHS Enterprise,"[6] which were engaged in patterns of racketeering activity, including wire fraud, in violation of 18 U.S.C. § 1962(d).

Counts III and IV assert claims against the Bank Defendants for conspiring to facilitate RICO enterprises, in violation of 18 U.S.C. § 1962(d). Specifically, Reyes alleges after Zions Bank initiates wire transfers from consumers' accounts into its own accounts, the funds are transferred into the fraudulent telemarketers' accounts with the Bank Defendants. Frequently, the telemarketers then direct the Bank Defendants to transfer such funds to off-shore accounts. Reyes asserts the Bank Defendants, in conducting these transactions, knowingly facilitated both the "Telemarketing Payment Enterprise"—the Zions Defendants—and the NHS/PHS Enterprise, by attempting to launder the proceeds of the telemarketing fraud. In alleging the Bank Defendants knew of, or were willfully blind to, the alleged conspiracy, Reyes asserts banking regulations required the Bank Defendants to scrutinize the accounts of their telemarketer customers, giving the Bank Defendants reason to know several of the individuals associated with the telemarketers had been involved with fraudulent telemarketing schemes and had been subject to government enforcement proceedings. Reyes also alleges the telemarketers' practice of directing the Bank Defendants to transfer funds into bank

---

[6] The NHS/PHS Enterprise is alleged to include NHS Systems, Inc., d/b/a National Healthcare Solutions (NHS) and National Health Net Online, and Physicians Health Service, LLC (PHS), d/b/a American Health Benefits on Line, Health Management, LLC, Plus Health Savings, Inc., Physicians Health Systems, Inc., 6676529 Canada, Inc., PHS Enterprises, First Step Management, Inc., Gold Dot, Inc., and Nevada Business Solutions, Inc. RICO Case Statement 22-23.

accounts in Canada, St. Lucia, and India was an additional "red flag" of misconduct, as banks are aware such transactions are indicative of money laundering, particularly by fraudulent telemarketers. Each of the Bank Defendants also "processed numerous adjustments in the amounts of $19.95, $29.95, and $299.95, representing individual consumer transactions that were challenged, refunded, or returned for insufficient funds."  RICO Case Statement  9.

Counts V and VI allege Teledraft violated § 1962(d) by joining the RICO conspiracy alleged in Count II, and conspiring to facilitate additional Telemarketer Enterprises, including the NHS/PHS Enterprise.  Reyes asserts when Teledraft assumed the payment processing for telemarketers formerly serviced by MP/ND, the same monitoring requirements and red flags that alerted the Zions Defendants to the fraud were present, and thus Teledraft knew such services would be facilitating the racketeering enterprises.  Also, Teledraft began servicing certain telemarketers in the NHS/PHS Enterprise after MP/ND referred the telemarketers to Teledraft, citing pressure from NACHA to terminate their relationship because their ACH return rates were too high.  Reyes asserts MP/ND even suggested Teledraft use RCC instead of ACH transactions to avoid NACHA scrutiny. Moreover, Teledraft was subject to an injunction resulting from an action by the Iowa Attorney General concerning its payment processing for fraudulent telemarketers, which required Teledraft to undertake even greater due diligence with respect to telemarketing clients.

**DISCUSSION**

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the facts pleaded "allow[] the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a Rule 12(b)(6) motion, a district court first should separate the legal and factual elements of the plaintiff's claims. *Fowler*, 578 F.3d at 210. The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210-11. The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 129 S. Ct. at 1950). Where a complaint involves averments of fraud, such allegations must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), and must state the circumstances constituting fraud with particularity. Fed. R. Civ. P. 9(b). Intent, knowledge, and other mental conditions, however, may be alleged generally. *Id.*

Under RICO, it is "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To plead a RICO claim pursuant to § 1962(c), the plaintiff "must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). Predicate acts of racketeering include, *inter alia*, use of unauthorized access devices, as prohibited by 18 U.S.C. § 1029, federal wire fraud under 18 U.S.C. § 1343, money laundering under 18 U.S.C. § 1956, and engaging in monetary transactions in property derived from unlawful activity, in violation of 18 U.S.C. § 1957. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity"). To establish a pattern of predicate RICO acts, a plaintiff must allege at least two predicate acts which are related and have continuity. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237-38, 240 (1989). Continuity of racketeering acts can be "both a closed-ended

and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241.  Showing closed-ended continuity requires pleading predicate acts which took place over a "substantial period of time," which the Third Circuit has interpreted to be at least twelve months. *Tabas v. Tabas*, 47 F.3d 1280, 1293 (3d Cir. 1995).  Open-ended continuity, on the other hand, can be shown by pleading "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 429 U.S. at 242.

Reyes has sufficiently pleaded his § 1962(c) claims against the Zions Defendants.  He alleges Zions Bank and MP/ND each serve independent and crucial roles in conducting an enterprise with the common purpose of earning fees for facilitating fraudulent telemarketing schemes.  Reyes also pleads with sufficient particularity facts showing the Zions Defendants engaged in racketeering activity consisting of wire fraud and access device fraud.  He states that on November 17 and 29, 2007, NHS initiated unauthorized ACH debits of $29.95 and $299.95, respectively, from his Commerce Bank account, and that these debits were processed by MP/ND through Zions Bank and resulted in a credit to a Zions Bank account.  Reyes asserts MP/ND committed access device fraud when it accessed his bank account to make unauthorized debits, and MP/ND and Zions Bank committed wire fraud when they transferred funds from Reyes's account into a Zions Bank account through ACH debits, knowing Reyes had not provided authorization for such debits.

In alleging the Zions Defendants knew the transactions were fraudulent, Reyes pleads facts showing Zions Bank and MP/ND were aware of several blatant indications of fraud, including NHS's and related telemarketers' staggeringly high rates of ACH returns, and in particular, rates of return for lack of authorization.  Reyes asserts Zions Bank discussed the high return rates with

MP/ND, and MP/ND communicated frequently with the allegedly fraudulent telemarketers about their return rates.  Reyes also alleges Zions Bank and MP/ND received notification from another bank they were violating NACHA's rule prohibiting ACH TEL transactions for outbound telemarketing, and received at least one complaint about unauthorized ACH transactions originated by NHS which they processed.  Furthermore, Reyes asserts Zions Bank, in complying with its due diligence requirements, either knew or remained willfully blind to the fact that several of the telemarketers for which it processed ACH TEL debits, including NHS, had been sanctioned for operating fraudulent telemarketing schemes.

Reyes also sufficiently pleads a pattern of such racketeering activity by the Zions Defendants.  Reyes alleges the Zions Defendants, as a regular part of their business, processed two unauthorized debits from his account, and processed multiple such debits from other class members' accounts, on behalf of fraudulent telemarketers during the 14-month period from January 2007 to March 2008.  These allegations are sufficient to state plausible claims against the Zions Defendants for violations of § 1962(c).

Section 1962(d) makes it unlawful to conspire to violate any of the substantive RICO provisions.  18 U.S.C. § 1962(d).  A defendant need not agree to individually perform acts amounting to a predicate RICO violation to be liable under § 1962(d).  *Smith v. Berg*, 247 F.3d 532, 537 (3d Cir. 2001) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997)).  Rather, "a defendant may be held liable for conspiracy to violate section 1962(c) if he knowingly agrees to facilitate a scheme which includes the operation or management of a RICO enterprise."  *Id.* at 538.  Where a defendant is alleged to have conspired with a RICO enterprise to violate § 1962(c) by providing it what would ordinarily be lawful professional services, "liability will arise only from services which

were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity."

*Id.* at 537, n.11.  Traditional conspiracy law governs the application of § 1962(d).  *See id.* at 537-38

(citing *Salinas*, 522 U.S. at 64-65).

Reyes alleges the Zions Defendants conspired to violate § 1962(c) with a number of RICO

enterprises, each comprised of individuals and business entities engaged in various fraudulent

telemarketing schemes.  One such Telemarketing Enterprise is the NHS/PHS Enterprise, which

includes NHS, the telemarketer Reyes alleges defrauded him.[7]  Reyes offers facts showing the

NHS/PHS Enterprise consists of several telemarketing businesses operated by the same individuals

for the purpose of carrying out systematic telemarketing fraud, whereby telemarketers offering

valueless products obtain consumers' bank account information in order to debit those accounts

without authorization.  Reyes also asserts, with sufficient supporting facts, this scheme constitutes

a pattern of wire fraud and access device fraud that continued for over a year and reflected the

NHS/PHS Enterprise's regular way of doing business.  Thus, Reyes has sufficiently alleged the

existence of at least one underlying § 1962(c) violation which the Zions Defendants are alleged to

have facilitated.

As detailed above, Reyes has also pleaded facts from which it can be reasonably inferred that

the Zions Defendants were aware the transactions originated by the NHS/PHS Enterprise constituted

a pattern of racketeering activity, yet continued to process those transactions pursuant to their

business arrangement.  Reyes has therefore sufficiently alleged the Zions Defendants knowingly

agreed to "facilitate a scheme which includes the operation or management of a RICO enterprise,"

---

[7] The other alleged Telemarketing Enterprises are the "Mishan Enterprise," the "Platinum Benefit Group Enterprise," the "Vexedle Enterprise," the "RTS Enterprise," and the "RXSmart Enterprise." RICO Case Statement 24-28.

*Smith*, 247 F.3d at 538; hence, the Zions Defendants' motion to dismiss is denied.

Reyes has also sufficiently alleged Teledraft conspired to violate § 1962(c) with (1) an enterprise consisting of the Zions Defendants and the Telemarketing Enterprises, and (2) an enterprise consisting of one or more of the Telemarketing Enterprises, including the NHS/PHS Enterprise. Reyes asserts in February 2008, MP/ND wrote to Teledraft and recommended it serve as the payment processor for certain telemarketers within the NHS/PHS Enterprise which MP/ND was forced to stop servicing due to pressure from NACHA concerning the telemarketers' high rates of unauthorized ACH debits. MP/ND advised Teledraft the telemarketers' 2.9% rate of unauthorized returns was above the 1% NACHA limit, and further recommended Teledraft use RCC transactions, which are not governed by the NACHA rules, to process payments for these entities. Teledraft began processing payments for these telemarketers despite what Reyes asserts were glaring indicia of fraud in both the correspondence from MD/NP and other available information, including these telemarketers' extraordinarily high return rates during various periods over the previous year.

The fact the Iowa Attorney General obtained an injunction against Teledraft significantly bolsters the inference Teledraft knew of the ongoing conspiracy. The Iowa action alleged Teledraft assisted fraudulent telemarketers by performing essentially the same function Teledraft and MD/NP are alleged to have performed in this case. Moreover, the injunction subjected Teledraft to special due diligence obligations pertaining to any future telemarketing clients, including mandating that Teledraft "'exclude any reasonable suspicion that the entity is engaged in telemarketing activity that violates' the FTC Telemarketing Sales Rule, the NACHA TEL Rule, or Iowa consumer protection laws." RICO Case Statement 10 (alterations omitted) (quoting Stipulated Final Judgment., *Iowa v. Teledraft, Inc.*, No. 04-90507 (S.D. Iowa, Dec. 9, 2005), ECF No. 36). It also prohibited Teledraft

from processing payments for any client with an unauthorized return rate for ACH transactions above 2.5%.  Considering these particularized obligations and the facts expressly conveyed  to Teledraft indicating the telemarketers and the Zions Defendants were engaging in fraud, it can easily be inferred that Teledraft knowingly agreed to facilitate enterprises engaged in patterns of racketeering activity.  Teledraft's motion to dismiss for failure to state a claim is therefore denied.

Finally, Reyes alleges the Bank Defendants violated § 1962(d) by conspiring to violate § 1962(c) with two separate RICO enterprises: (1) the Telemarketing Payment Enterprise, consisting of the Zions Defendants, and (2) the NHS/PHS Enterprise.  Specifically, Reyes accuses Wachovia, Wells Fargo, and National Penn of laundering the proceeds from the fraudulent telemarketing schemes by transferring funds from the telemarketers' accounts with these banks to accounts overseas.  Because this Court has already found Reyes has sufficiently alleged the Telemarketing Payment Enterprise and the NHS/PHS Enterprise violated § 1962(c), the sole remaining question is whether the Bank Defendants' services to their telemarketing customers "were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity." *Smith*, 247 F.3d at 537, n.11.

Reyes pleads no facts directly showing any Bank Defendant knew of the alleged underlying RICO violations.  Rather, he cites several warning signs available to the Bank Defendants, and argues the existence of such warning signs indicate the banks either must have known about the illegal source of the funds in the telemarketers' accounts, or remained willfully blind to that fact. First, Reyes posits the Bank Defendants, in performing their required due diligence regarding the telemarketers' accounts, must have known the holders of these accounts were telemarketers, a fact that would have triggered even greater due diligence requirements because  telemarketers are "high-

risk" customers.  As a result, the banks must have inquired into these customers and found these particular telemarketers had histories of fraudulent conduct.

Second, Reyes alleges the transactions associated with the telemarketers' accounts, especially under the heightened scrutiny the Bank Defendants were obligated to exercise, must have alerted the banks to the pattern of racketeering activity conducted by the telemarketers and the Zions Defendants.  Specifically, Reyes submits that two telemarketers within the NHS/PHS Enterprise opened accounts at Wachovia into which money was wire transferred from Zions Bank, and from which money was later transferred to countries which are known money laundering havens for fraudulent telemarketers.  Reyes asserts Wells Fargo and National Penn each maintained one NHS/PHS-held account where the same kind of activity occurred.  He also asserts that from each of these accounts "numerous adjustments [were processed] in the amounts of $19.95, $29.95, and $299.95, representing individual consumer transactions that were challenged, refunded, or returned for insufficient funds."  RICO Case Statement 9.

From these few, indirectly supporting facts, it would be unreasonable to make the inferential leap that the Bank Defendants knew of the underlying RICO violations.  Conspicuously absent from Reyes's allegations are any facts indicating Wachovia, Wells Fargo, or National Penn were aware, or could have become aware, of the kind of telling indications of fraud that were available to the Zions Defendants or Teledraft.  Reyes does not assert the Bank Defendants knew the telemarketers were using ACH TEL transactions in violation of NACHA operating rules or knew their ACH return rates were abnormally high.  Nor does he contend this information would have been available to a bank conducting even the most rigorous due diligence.  Instead, he speculates the Bank Defendants, in performing their due diligence, must have known the telemarketers had a history of fraud,

observed that they were sending money overseas, and concluded the telemarketers and the Zions
Defendants were engaged in a pattern of racketeering activity.  While such facts may arguably be
"consistent with" the Bank Defendants' liability, they "stop[] short of the line between possibility
and plausibility of entitlement to relief."  *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at
557).

      Moreover, Reyes does not even assert the Bank Defendants actually performed any required
due diligence.  Rather, he concludes because of their due diligence requirements and the available
warning signs of money laundering, if the Bank Defendants were not aware of the underlying RICO
violations, it is only because they deliberately ignored them.  This deliberate ignorance or "willful
blindness" contention, however, provides Reyes no help in "nudg[ing] [his] claims across the line
from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  Willful blindness is established "by
proving that a defendant was objectively aware of the high probability of the fact in question, and
could have recognized the likelihood of illicit acts yet deliberately avoided learning the true facts."
*United States v. Flores*, 454 F.3d 149, 155 (3d Cir. 2006) (internal quotation marks and citations
omitted).  "Willful blindness is not to be equated with negligence or lack of due care," and is not
attributable to a defendant "simply because he or she should have known of facts of which he or she
was unaware."  *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000).  Rather, willful
blindness "requires *conscious* action in light of *known* facts amounting to a charade of ignorance."
*Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 240 (5th Cir. 2010) (quotation omitted).  Without any
facts indicating the Bank Defendants deliberately avoided evidence of the underlying racketeering
activity, or even whether they actually inquired into these customers' businesses, Reyes's contention
amounts to equating the Bank Defendants' lack of due care with a conscious affirmative effort to

remain ignorant.  Without more, this Court cannot draw a reasonable inference the Bank Defendants knew their services "were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity."  *Smith*, 247 F.3d at 537, n.11.

The detailed description of the Zions Defendants' integral role in the fraud set out in Reyes's lengthy Amended Complaint and equally lengthy RICO Case Statement highlights the dearth of facts indicating the Bank Defendants' knowledge.  In fact, the facts actually pleaded bolster the "obvious alternative explanation" that the Bank Defendants, by merely providing ordinary banking services totally outside of, and unrelated to, the unauthorized debits, did not knowingly agree to launder proceeds of racketeering activity.  *Iqbal*, 129 S. Ct. at 1951-52 (considering "obvious alternative explanations" in deciding if illegality plaintiff asks court to infer is plausible (quoting *Twombly*, 550 U.S. at 567-68)); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 322-23 (3d Cir. 2010) (holding, in antitrust context, "allegations of conspiracy are deficient if there are obvious alternative explanations for the facts alleged" (quotation omitted)).  While Reyes alleges the Zions Defendants' daily communications with the NHS/PHS Enterprise concerning its operations, including its high return rates and specific consumers, gave them an intimate understanding of the NHS/PHS Enterprise's fraudulent operations, he does not allege any such communications occurred between the Bank Defendants and either the Zions Defendants or the telemarketers.  Unlike the Zions Defendants, the Bank Defendants played no role in extracting money from consumers' accounts.  Reyes's assertion the Bank Defendants processed "numerous adjustments . . . representing transactions that were challenged," RICO Case Statement 9, noticeably stops short of stating the Bank Defendants returned those transactions upon notification such transactions were made without the consumers' authorization.

17

The cases cited by Reyes wherein § 1962(d) claims against service providers survived motions to dismiss further demonstrate the lack of adequate facts supporting Reyes's claim the Bank Defendants knew of the pattern of racketeering activity. In each case, the plaintiffs pleaded facts that directly connected the defendant-service provider with the underlying RICO violation. *See, e.g.*, *Meeks-Owens v. Indymac Bank, F.S.B.*, 557 F. Supp. 2d 566, 569 (M.D. Pa. 2008) (denying dismissal of § 1962(d) claim by borrowers against lender-bank for fraudulent home lending scheme where bank allegedly knew contract price and mortgaged value of property substantially exceeded market value of property and provided plaintiff false information about nature of the loan); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 376 (S.D.N.Y. 2005) (denying dismissal of § 1962(d) claim against bank alleged to have facilitated Ponzi scheme involving fake currency by providing debit cards to access such currency because plaintiff pleaded facts directly showing knowledge of fraud, including a letter from bank falsely denying it had a relationship with co-conspirator and stating it declined to service co-conspirator because its investigation found co-conspirator had been engaged in fraud).

Ignoring Reyes's legal conclusion the Bank Defendants knew of the racketeering activity, the few facts he provides supporting this contention indicate nothing more than the Bank Defendants shared some connection with alleged RICO enterprises through the ordinary services they provided as banks. As one court of appeals aptly put it, "[a] defendant cannot be held liable for a RICO conspiracy merely by evidence that he associated with other conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul." *Chaney*, 595 F.3d at 239 (quotation and alteration omitted). For these reasons, the claims against Wachovia, Wells Fargo, and National Penn are dismissed. Because Reyes has now had three opportunities to plead his claims

18

against these defendants, resulting in three rounds of motions to dismiss, the claims will be dismissed with prejudice. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding leave to amend need not be given where plaintiff has "repeated[ly] fail[ed] to cure deficiencies by amendments previously allowed"); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 608 (5th Cir. 1998) ("Plaintiffs are represented by able counsel and have had three opportunities to articulate their damage theory—in the complaint, the RICO case statement, and brief in response of the motion to dismiss. Pinnacle should not be subjected to any further costs of litigation in this lawsuit.").

As a final matter, this Court rejects Teledraft's challenge to personal jurisdiction and its and the Zions Defendants' challenge to venue. "Under Federal Rule of Civil Procedure 4(k), a District Court typically exercises personal jurisdiction according to the law of the state where it sits." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). The Pennsylvania long-arm statute authorizes the exercise of personal jurisdiction "to the fullest extent allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b). Where a defendant is not subject to general jurisdiction due to its lack of continuous, systematic contacts with the forum state, it may still be subject to specific jurisdiction where: (1) the defendant has purposefully directed its activities at the forum; (2) the litigation arises out of those activities; and (3) the exercise of jurisdiction "otherwise comports with fair play and substantial justice." *O'Connor*, 496 F.3d at 317 (internal quotation marks and citations omitted); *see also* 42 Pa. Cons. Stat. § 5322(a)(1) (providing Pennsylvania courts may exercise personal jurisdiction over an entity transacting business in the state).

With respect to Teledraft's motion to dismiss for lack of personal jurisdiction, Reyes has sufficiently shown Teledraft, by providing payment processing services to several co-conspirator

telemarketers located within this judicial district, is subject to specific personal jurisdiction in this forum. *See* 42 Pa. Cons. Stat. § 5322(a)(1). Specifically, Reyes has proffered a June 30, 2008, report by the receiver appointed to operate several of the NHS/PHS Enterprise's businesses as part of an FTC action in this district. *See Fed. Trade Comm'n v. NHS Sys., Inc.*, No. 08-2215 (E.D. Pa). The report, which this Court finds is competent evidence and which Teledraft has not contested, states NHS Systems, Inc. maintains a business location in Collegeville, Pennsylvania—which is within this judicial district—and states Teledraft served as the payment processor for several of the NHS/PHS Enterprise telemarketers operating out of that location, including Health Management LLC, PHS, and Physicians Health Systems, Inc. Grogan Decl. Ex. I, at 9. Accordingly, Teledraft's motion to dismiss for lack of personal jurisdiction is denied.

Teledraft's motion to dismiss for improper venue is also denied. In this case, venue is appropriate in this judicial district if one Defendant resides in this district and all Defendants reside in Pennsylvania. *See* 28 U.S.C. § 1391(b)(1). A defendant corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. *Id.* § 1391(c). Where a state has multiple judicial districts, as is the case in Pennsylvania, a corporation will be deemed to reside in any district in which, treating that district as if it were a separate state, it would be subject to personal jurisdiction. *Id.* at § 1391(d). Having established Teledraft is subject to this Court's personal jurisdiction pursuant to its contacts in this judicial district, and the Zions Defendants having processed payments for the same telemarketers located in this judicial district,[8] venue is proper.

Additionally, the Zions Defendants' request to transfer this case to the District of Utah

---

[8] Indeed, the Zions Defendants do not dispute they are subject to this Court's personal jurisdiction.

pursuant to 28 U.S.C. § 1406 is denied, as § 1406 provides for transfer or dismissal where venue is improper.  Insofar as the Zions Defendants seek transfer to the District of Utah in the interest of justice and for the convenience of the parties pursuant to 28 U.S.C. § 1404(a), this request is also denied because the Zions Defendants have not satisfied their burden of establishing the need for transfer.  *See Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995) (providing factors to consider § 1404(a) request and noting "plaintiff's choice of venue should not be lightly disturbed" (quotation omitted)).

An appropriate order follows.

BY THE COURT:

\s\ Juan R. Sánchez
Juan R. Sánchez, J.