IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| REYNALDO REYES | : | CIVIL ACTION |
| *On Behalf of Himself and All Others* | : | |
| *Similarly Situated* | : | No. 10-345 |
| | : | |
| v. | : | |
| | : | |
| ZIONS FIRST NATIONAL BANK, et al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                             September 23, 2013

      Plaintiff Reynaldo Reyes brings this Racketeer Influenced and Corrupt Organizations Act (RICO) class action suit alleging fraud by several banking institutions. Reyes claims Defendant Zions First National Bank (Zions Bank) and two of its subsidiaries, NetDeposit LLC (ND) and MP Technologies d/b/a Modern Payments (MP),[1] collectively, the "Zions Defendants," knowingly provided banking services to fraudulent telemarketers in violation of 18 U.S.C. § 1962(c) and (d).[2] Reyes asks this Court to certify a class of individuals who, like him, were defrauded by telemarketers receiving banking services from the Zions Defendants. Upon review of the parties' submissions and case law regarding class certification, the Court concludes the class cannot be certified and Reyes's motion for class certification will be denied.

**BACKGROUND**

      In November 2007, a telemarketer from National Healthcare Solutions (NHS) called Reyes and told him he was eligible for a government grant and, if he provided his bank account

---

[1] MP was merged into or otherwise combined with ND in 2008.
[2] Reyes also named several major banks as defendants, alleging they held bank accounts of the fraudulent telemarketers, and asserted claims against Teledraft, Inc. This Court dismissed Reyes's claims against the other major banks in a prior order. Although the Court allowed the claims against Teledraft to proceed to class certification, Teledraft has since filed for bankruptcy.

information, the government would deposit grant funds directly into Reyes's account. The telemarketer did not tell Reyes he would incur any charges in connection with this grant or that any money would be withdrawn from his account. Reyes provided information for his account at Commerce Bank, and NHS then initiated a debit from this account in the amount of $29.95, which was processed by MP. MP provided information regarding the allegedly authorized deduction and Reyes's account number to Defendant Zions Bank, which completed a wire transfer of the funds from Reyes's Commerce Bank account into an account at Zions Bank. Almost two weeks later, NHS initiated a second deduction in the amount of $299.99 which was also processed by MP. Reyes did not authorize these deductions, and he did not receive a government grant. Because Reyes had insufficient funds in his Commerce Bank account to cover the withdrawals, he incurred overdraft fees and suffered a loss of nearly $400. After the two withdrawals from his account were completed, Reyes called NHS to complain, and an NHS representative played him an audio recording, which the representative claimed evinced Reyes's oral consent for NHS to deduct funds from his bank account. Reyes asserts this recording was either fraudulently altered or taken out of context.

Reyes alleges the Zions Defendants participated in similar transactions with NHS and other fraudulent telemarketers to withdraw funds from the bank accounts of proposed class members. The scheme allegedly works as follows: representatives from several telemarketing firms, which have all been the subject of government consumer-fraud enforcement actions, call individuals and offer them valueless or significantly undervalued products, such as nonexistent government grants, worthless discount health programs, or a host of other services. In addition to contacting prospective victims by phone, the telemarketers also use solicitations over the Internet and "slamming," a process whereby a telemarketer acquires a list of consumers and their bank

account information, typically from another telemarketer that engages in the business of buying and selling such lists. Using the customer account information from these lists, telemarketers misrepresent to consumers that they are trying to verify the account information, or, more often, initiate money transfer transactions without ever contacting the victims.

Because telemarketers cannot obtain funds from checking accounts of consumers unless there is a bank willing to process the transaction, the scheme requires participation of other parties. Most banks will not deal with telemarketers; thus, telemarketers will use third party payment processors like MP and Teledraft. The payment processor establishes an account at the bank in its own name or the name of the telemarketer and, using the victims' account information, collects payments from the victims' bank account into the payment processer's bank account. After receiving funds from the victims, the payment processor deducts a fee for itself and transmits the balance to the telemarketer. A payment processor can use one of two methods to obtain payment based on a consumer's bank information: 1) electronic transfer through an Automated Clearing House debit (ACH); or 2) a remotely created paper check/demand draft (RCC).

Under the ACH method, the telemarketer provides the payment processer with the consumer's bank account information, which the payment processer uses to direct the bank to initiate a wire transfer through the ACH system from the consumer's account into the payment processor's account. Both the payment processer and the processor's bank take a fee and the remaining funds are transferred into the telemarketer's bank account. The RCC method involves a paper check created by the payment processor drawn on the consumer's bank account, which includes the printed statement "authorized by drawer" or other similar language in lieu of a signature. The RCC is made out to the telemarketer and is either deposited directly into the

telemarketer's account, or deposited first into the processor's account before being transferred to the telemarketer's account. Each RCC generates a fee for the payment processor. In this case, MP used only the ACH method of processing payments, but Teledraft used the RCC method.

The essence of Reyes's claims is that MP and Zions (and later Teledraft) knew the ACH debits and RCC transactions they executed for the relevant telemarketing clients were fraudulent. Reyes's central burden, therefore, is to show the Defendants knew they were facilitating a scheme to defraud by processing the transactions. In support of his class certification motion, Reyes presents the Court with evidence he contends demonstrates the fraudulent nature of the transactions. The most significant evidence is the "return rates" for each of the alleged fraudulent telemarketers. When an ACH debit cannot be completed due to insufficient funds of the consumer, or when the consumer complains an ACH debit was not authorized, the transaction is "returned" and the funds are placed back in the consumer's account by the bank which conducted the transaction. The National Automated Clearing House Association (NACHA) publishes industry return rates and has stated high return rates are a strong indication of fraud. In this case, all of the allegedly fraudulent telemarketers had return rates significantly higher than the national average. Further, internal communications demonstrate the high return rates were issues of concern for both MP and Zions Bank. NACHA itself had expressed concern over the rates to the Defendants.

Reyes also offers evidence of several other indicators that the Defendants were aware of the fraud. For example, Reyes asserts MP knowingly and improperly "coded" cold-call telemarketing transactions, for which ACH transactions are not permitted, as recurring transactions, which are permitted through ACH. Reyes also argues MP and Zions violated their obligations under federal banking regulations to do reasonable due diligence in monitoring their

customers; had they followed the proper administrative procedures, they would have learned the telemarketers for which they did processing had long histories of regulatory sanctions for fraud.

Reyes asks this court to certify a class consisting of "[a]ll individuals in the United States as to whom ACH debit entries or remotely created check drafts on their accounts were prepared by defendants Netdeposit, Modern Payments, or Teledraft during the four-year period immediately preceding the filing of this action and finally charged to the class members' bank accounts by a Telemarketer, or pursuant to information provided to defendants Netdeposit, Modern Payments, or Teledraft by the Telemarketers, or who otherwise incurred any bank charges as a consequence of such ACH debit entries or remotely-created checks." Pl.'s Mot. for Class Certification 1-2, ECF No. 140. The class includes at least tens of thousands of persons. *Id.* at 2. In his Second Amended Complaint, Reyes specifically names at least six different telemarketers as part of the "Telemarketing Enterprises"[3] who did business with MP. *See* Second Am. Class Action Compl. at 5-13, ECF No. 188. Reyes asks this Court to certify the class and hold Zions Defendants liable under the RICO statutes.

**DISCUSSION**

To obtain class certification, a plaintiff must demonstrate the proposed class satisfies all four elements of Federal Rule of Civil Procedure 23(a), along with one of the three requirements Rule 23(b). *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2548 (2011); *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 624 (3d

---

[3] Reyes and Defendants disagree over the exact number of telemarketers (also referred to as merchants) doing business with MP. Reyes repeatedly refers to the "six mass-marketing entities at issue here." Reply Mem. in Supp. of Pl.'s Mot. for Class Certification 47, ECF No. 167. Yet, the Zions Defendants refer to "ten merchants now accused by Plaintiff of being fraudulent." Zions Defs.' Resp. in Opp'n to Pl.'s Mot. for Class Certification 53, ECF No. 158. It appears some of the merchants at issue are subsidiaries of others or share common ownership, so the precise number of individual merchants is not definite. In any event, this slight variation is not relevant to the class certification issue.

Cir. 1996). Rule 23(a) requires a showing of: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a). Rule 23(b) can be satisfied three different ways. In this case, Reyes advances his certification under Rule 23(b)(3), which requires the plaintiff to show "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

When deciding whether to certify a class under Rule 23, the district court must make whatever factual and legal inquiries are necessary to determine that each requirement of Rule 23 is met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). Furthermore, the court's findings as to the Rule 23 requirements must be supported by factual determinations made by a preponderance of the evidence; a threshold showing by a party is not sufficient. *Id.* A court must "resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Id.*

In this case, the Court need not decide whether the proposed class action meets the requirements of numerosity, typicality, or adequacy of representation because the class fails to meet the commonality requirement of Rule 23(a)(2) and the predominance requirement of Rule 23(b).

Under the commonality prong, there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(b)(3). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). However, a finding of commonality does not require that all class members share identical claims, and indeed "factual differences

among the claims of the putative class members do not defeat certification." *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 148 F.3d 283, 310 (3d Cir.1998) (quoting *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994)). Common questions are not the focus; rather, the classwide proceeding must be capable of "generat[ing] common *answers* apt to drive the resolution of the litigation," such that a determination of the truth or falsity of the contention "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551 (internal citation and quotation marks omitted).

Similarly, "the Rule 23(b)(3) predominance element 'requires that common issues predominate over issues affecting only individual class members.'" *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 263 (3d Cir. 2009) (quoting *In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 527-28 (3d Cir. 2004). While the predominance test bears some similarity to the elements of Rule 23(a), it is "a standard far more demanding than the commonality requirement." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 310-11. A plaintiff must demonstrate that the elements of the cause of action are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311-12. Because common issues must *predominate* over individual claims, "[i]f proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Id.* at 311 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)).

In addition, when certifying a class for trial (as opposed to purely for settlement purposes) special considerations come into play. Because the nature of the evidence answers the question under 23(b)(3) of whether a question is common or individual, "a district court must formulate some prediction as to how specific issues will play out [during trial] in order to

determine whether common or individual issues predominate in a given case." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (quoting *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)). The court must assess the available evidence and how the plaintiff will use the evidence to prove impact on a classwide basis. *Id.* at 312. Importantly, "the court should not suppress 'doubt' as to whether a Rule 23 requirement is met—no matter the area of substantive law." *Id.* at 321. Thus, in order to certify a class in a RICO suit, a court must give special consideration as to how the plaintiff will prove his case at trial, and find each of the requirements for class certification is met, including a finding that the RICO cause of action can be established by evidence common to the class.

To establish liability under 18 U.S.C. § 1962(c) and (d) of the RICO statutes a plaintiff must demonstrate (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus (5) an injury to business or property. *In re Ins. Brokerage Antitrust Litig.* 579 F.3d at 269 (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)). Thus, the plaintiff must show he was injured by the racketeering activity and that the racketeering activity was not only the "but for" cause of his injury, but also the proximate cause. *Breslin v. Brainard*, 128 F. App'x 237, 240 (3d Cir. 2005) (citing *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992)). Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268; *see also Breslin*, 128 F. App'x at 240 (explaining the plaintiff must have been injured by "racketeering activity" to set out a prima facie showing of a civil RICO violation under 18 U.S.C. § 1964(c)). To satisfy the commonality and predominance requirements of Rule 23 in a RICO class action case, the court must find each element of the alleged RICO violation involves common questions of law and fact capable of proof by evidence common to the class. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269.

As Reyes points out, the Third Circuit has certified numerous class action suits involving RICO violations. For example, in *In re Ins. Brokerage Antitrust Litig.*, the plaintiffs brought class actions under the Sherman Act, RICO, and state law alleging insurance brokers solicited fixed bids from insurance companies and then received improper commissions for directing customers to those companies. *Id.* at 249. The plaintiffs claimed the fees paid by the insurance companies to the brokers were built into the premiums then charged to members of the class, and therefore, class members, even if they had no contact with the insurance brokers, paid insurance premiums in excess of what they would have paid had the broker defendants not violated their fiduciary duties. *Id.* at 269.

Ultimately, the court held the predominance requirement for class certification was satisfied because each element of the alleged RICO violation involved common questions of law and fact. *Id.* at 270. The court explained the first four elements of a RICO claim—(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity—focused on the defendants' conduct and the effect of that conduct. Thus, these elements clearly involved questions that were common to all members of the proposed plaintiff class. *Id.* at 269-70, 278. When discussing the last element—injury—the court admitted "establishing an injury is not as conducive to common proof because it requires that a plaintiff demonstrate harm to his property or business." *Id.* at 270. However, the court found the plaintiffs had presented a plausible theory for proving classwide injury as a result of the alleged racketeering activities, "even if the amount of damage that each plaintiff suffered could not be established by common proof." *Id.* at 269-70. Since the settlement class only included policy holders who either purchased insurance from the insurance companies involved in the fraud or relied upon one of the broker defendants, all class members were subjected to higher premiums, and "the plaintiffs' theory for proving [RICO] injury would

9

apply to all of the class members." *Id.* at 269;[4] *see also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir. 1977) (holding proof of injury for class certification in a Sherman Act antitrust case is established as long as the nationwide conspiratorially affected prices were higher than they would have been under competitive conditions because then "all members of the class suffered some damage, notwithstanding that there would be variations . . . as to the extent of their damage").

In other cases, courts have recognized the "complete sham" theory for proving common injury in a RICO class action. Under this theory, when a defendant's conduct is so wrought with fraud as to be a complete sham, the class members' participation or involvement with the defendant is sufficient evidence that each class member suffered damages, rendering an analysis of individual transactions unnecessary. In *Cullen v. Whitman Medical Corp.*, for example, the court certified a RICO class under the complete sham theory. 188 F.R.D. 226, 235 (E.D. Pa. 1999). In that case, present and former students of a vocational school brought a class action against the school for RICO violations, alleging fraudulent misrepresentations as to the education they would receive. *Id.* at 228. The court refused to certify the case based on a fraudulent misrepresentation theory because such a theory would require the court to determine if each individual student relied on the school's misrepresentations, making the case ill-suited for class litigation. *Id.* at 233. Instead, the court approved the class under a theory that the school was a complete sham, finding that under this theory the "mere fact that a plaintiff incurred debt to attend a school that was valueless is proof that the plaintiffs were taken in by the

---

[4] The court was also careful to point out that the class had been certified for settlement purposes and not for trial. Thus the court was "not as concerned with formulat[ing] some prediction as to how this element of a . . . violation would play out at trial" and "instead our inquiry into the element of . . . injury is solely for the purpose of ensuring that issues common to the class predominate over individual ones." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269 (internal citation and quotation marks omitted).

10

misrepresentation that the school was a viable vocational program." *Id.* at 234. Thus, "the students' very choice to go to the school is sufficient evidence that they were fraudulently induced to enroll." *Id.* at 243-35; *see also Lester v. Percudani*, 217 F.R.D. 345, 352 (M.D. Pa. 2003) ("Under certain circumstances, courts may presume class-wide damage on the basis of 'fraud on the market,' or a similar theory, under which the fraudulent conduct itself causes injury regardless of the nature of individual transactions.").[5]

An essential element of the cause of action for a RICO violation case is injury to the plaintiff proximately caused by the defendant's racketeering activity. Thus, in a class action, the plaintiff must demonstrate to the court that this element can be established by proof common to all class members. Here, Reyes has not demonstrated he can meet this requirement without individual issues predominating. Hence, the proposed class will not be certified.

Relying upon the complete sham theory, Reyes claims he will prove that every telemarketer named in the Complaint was completely fraudulent, that the Defendants participated

---

[5] Recently, in *Comcast Corp. v. Behrend*, the Supreme Court held a class action was improperly certified under Rule 23(b)(3) because the Third Circuit refused to entertain arguments against the plaintiffs' damages model on the basis that such arguments would delve into the merits of the case. 133 S. Ct. 1426, 1432 (2013). The defendants asserted certification was improper because plaintiffs "had failed to establish that damages could be measured on a classwide basis." *Id.* at 1431 n.4. Although the Court, in its decision decertifying the class, agreed the plaintiffs' damages model did not establish that damages were capable of measurement on a classwide basis, *id.* at 1433, the Court focused more on the Third Circuit's refusal to consider the merits of the case during the class certification stage. The Court emphasized "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and "[s]uch an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim." *Id.* at 1432 (internal citations and quotation marks omitted). Therefore, this Court interprets the holding as placing an emphasis on a court's ability to delve into the merits of a case to ensure compliance with Rule 23(b)(3) and not on the necessity of proving damages on a classwide basis. *See id.* at 1436 (Ginsburg & Breyer, JJ., dissenting) ("[T]he decision should not be read to require, as a prerequisite to certification, that damages attributable to a classwide injury be measurable 'on a class-wide basis.'"); *id.* at 1437 ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal.").

in the fraud, and as a result, that any consumer who gave a telemarketer account information which was later processed by the Defendants must have been proximately injured by the Defendants' actions. Because he is using the complete sham theory, Reyes asserts he is not restricted by Third Circuit precedent holding that schemes involving non-uniform sales presentations and oral, rather than written, communications are not appropriate for class certification. Under those cases, the only way to determine if a class member was defrauded was to individually examine the interaction between the defendant and each class member. *See, e.g.*, *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 190 (3d Cir. 2001) ("[I]t has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action."); *In re LifeUSA Holding Inc.*, 242 F.3d 136, 146 (3d Cir. 2001) (denying class certification because the predominance requirement was not met when plaintiffs' claim arose out of representations made to "over 280,000 purchasers by over 30,000 independent agents [and] the sales presentations . . . were neither uniform nor scripted"); *cf. In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d at 316 (affirming class certification in a case involving deceptive sales practices in which the sellers relied on uniform, scripted, and standardized sales presentations).

Since this is a certification issue for a case headed to trial, this Court must assess how Reyes will use the evidence at trial to prove impact on a classwide basis, and the Court cannot have any doubt as to whether the Rule 23 requirements are met. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311, 321. In his plan to prove the telemarketers were complete shams and the Defendants must have known about the fraud, Reyes relies heavily on the return rates of the telemarketers' transactions. Reyes names several telemarketers that interacted with consumers in different ways (by telephone, internet, and slamming), and although the return rates

differed among the individual telemarketers, the rates were generally higher than average. However, the high return rates, although indicative of fraud, are not dispositive. Reyes's expert witness, Wayne D. Geisser, stated as much in his deposition, characterizing a higher return rate as "a red flag, an indicia of fraud." *See* Geisser Dep. 256:7-256:8, Nov. 1, 2012; *see also id.* at 257:9-257:20 (same). As Geisser explained, the high return rates cause investigators to ask a chain of questions about how the bank responded and whether the bank investigated the transactions. *Id.* at 256:17-257:4. High return rates are simply "a starting point" for an interrogation. *Id.* at 257:20; *see also* Hr'g Tr. 93:1-95:4, Jan. 18, 2013, ECF No. 170 (same). A second expert for Reyes, Jeanette Adair Fox, Senior Director of Risk Investigations of the NACHA, when asked whether the high return rates necessarily meant MP and Zions were knowingly involved in a scheme to defraud consumers, testified she could not give an opinion. *See* Fox Dep. 332:1-332:22, Nov. 12, 2012. Her refusal to draw a conclusion based on the return rates is further evidence that high return rates are not dispositive of fraud.

Furthermore, at the hearing on Reyes's class certification motion, the Defendants also presented testimony from David Georgione, president of Digital Network Corporation and Platinum Benefits Group (PBG), the latter of which was named as a telemarketer in Reyes's Complaint, to demonstrate that at least one of the named telemarketers sold a product that was not a complete sham. *See* Hr'g Tr. 82:24-83:4, Jan. 17, 2013, ECF No. 169. Georgione testified PBG sold a prepaid MasterCard that came with benefits like a prescription plan, discount dental program, nurse hotline, and roadside assistance. *See id.* at 83:16-17 & 86:25-87:12. Georgione disagreed with Reyes's assertion that the products sold by the merchants were part of a scheme and no reasonable consumer would ever buy them. *See id.* at 84:8-84:14. He testified his sister used the card to save money on her braces, his wife used it for access to a nurse, and customers

13

used the roadside assistance quite a bit. *See id.* at 93:13-93:20. His testimony demonstrates that while many of the telemarketers may have been operating frauds, Georgione's company sold an actual product that could be used for real savings; thus, it is possible that not every telemarketer named in the Amended Complaint is a complete sham.

Because Reyes almost completely relies on the high return rates as his proof of the complete sham, and the returns are different for each telemarketer, he cannot prove this complete sham theory on evidence common to the class since members of the class interacted with different telemarketers. Further, since Reyes's experts have testified that the return rates are only "red flags" of fraud and not absolute proof of fraud, the factfinder would have to analyze each telemarketer separately to determine whether or not it is a complete sham. In addition, given that at least one telemarketer, PGB, sold a real product, it is likely that representatives of other telemarketers will similarly testify that their companies also sell real products and are not complete shams. Thus, Reyes's attempt to prove "complete sham" will actually result in individual inquiries as to each telemarketer, and such inquiries preclude class certification.

Reyes's alternative to the complete sham theory is to prove at trial that the injury suffered was common to the class, but this approach also fails. *See generally In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269 (allowing class certification on the theory all class members were affected by higher insurance premiums due to the defendants' fraudulent actions). Although the evidence indicates some fraud, Reyes would not be able to establish there was an impact that affected each class member in the same way. Members were contacted by telemarketers through different mediums about different products, and some, according to Reyes, were not contacted at all because the telemarketers bought their account information from other telemarketers. Geisser, Reyes's expert witness, detailed the variety of methods the telemarketers used to convince the

14

consumers to provide their account information. For example, some promised government grants or refunds of taxes, while others offered medical health discount cards and gas voucher programs. Geisser Dep. 149:10-152:8, Nov. 6, 2012. Some consumers complained the cards they received did not include the discounts promised while others never received their cards in the first place. *See id.* at 152:9-153:4. Additionally, some consumers were promised "freebies" if they tried a discount card, but then received only the product and not the freebies. *See id.* at 153:7-154:21. As a result, individual class members' interactions with each telemarketer would dominate the injury analysis, and thus, the injury cannot be proven by evidence common to the class.

Furthermore, Reyes has not established that even if he could prove common injury, he can also demonstrate by evidence common to the class that Defendants were aware each telemarketer was completely fraudulent, as required to show Defendants' racketeering activity proximately caused the class members' injuries. Such an analysis would require a review of the Defendants' interactions with each telemarketer and the Defendants' knowledge as to each one. The evidence presented does not clearly separate each telemarketer but tends to treat the telemarketers as one entity. Further, although the return rates presented are specific to each telemarketer, these rates vary from telemarketer to telemarketer, indicating to the Court that the Defendants may have had a different awareness of fraud as to each telemarketer. As mentioned above, Reyes's expert Jeanette Adair Fox testified that she could not give an opinion about whether or not the high return rates meant MP and Zions were knowingly involved in a scheme to defraud consumers. *See* Fox Dep. 332:1-332:22, Nov. 12, 2012. Therefore, the rates alone could not establish the Defendants proximately caused injury to *all* class members by processing

the transactions from these different merchants; the fact-finder would have to individually analyze the Defendants' relationship and knowledge as to each telemarketer.

Because the evidence needed to prove the cause of action is specific to each telemarketer, the Court cannot certify the class. Accordingly, Reyes's motion for certification of the proposed class will be denied.

An appropriate order follows.

BY THE COURT:

/s/ Juan R. Sánchez
Juan R. Sánchez, J.